UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SHANTHI WEERASINGHE,

                           Plaintiff,

           -against-

METROPOLITAN LIFE INSURANCE COMPANY,

                         Defendant.
------------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
19-CV-4848 (JMA) (ARL)

**LINDSAY, Magistrate Judge:**

The plaintiff, Shanthi Weerasinghe ("Weerasinghe"), commenced this action on February 29, 2016, against Metropolitan Life Insurance Company ("MLIC"), in the Nassau County Supreme Court, by filing a summons alleging breach of contract, conversion and failure to pay wages under New York Labor Law.[1]  ECF No. 1.  On July 26, 2016, Weerasinghe filed a complaint asserting the same three causes of action but adding factual allegations including that MLIC had paid female employees lower wages than men.  *Id.* Ex. A.  On or about December 28, 2016, Weerasinghe filed an amended complaint in the state court.  *Id*. Ex. B.  Two and a half years later, Weerasinghe filed a motion seeking to amend her complaint for a second time to add a claim for race discrimination under 42 U.S.C. §1981.  *Id.* Ex. C.  Specifically, she sought to add a fourth cause of action alleging that MLIC had discriminated against her based on her race (South Asian) and her color (brown), subjected her to a hostile work environment, and retaliated against her for complaining of discrimination in violation of 42 U.S.C. §1981.  ECF No. 1.  Her motion was granted on August 8, 2019.  *Id.*  On August 23, 2019, MLIC removed the case to this Court.  *Id.*  Now before the Court, on referral from District Judge Azrack, is MLIC's motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56.  For the reasons set

---

[1] Weerasinghe initially referred to the defendant as MetLife, Inc.  ECF No. 1, Ex. A.

forth below, the undersigned respectfully recommends that the motion be granted, in part, and denied in part.

## BACKGROUND

The following facts are drawn from the parties' Local Rule 56.1 Statements and are uncontested unless otherwise noted.[2]

### A.    Weerasinghe's Early Employment History

Weerasinghe began her employment with MLIC in July 1992 as a life insurance agent in its Queens, New York office.  Def.'s Rule 56.1 Stmt. ¶ 1.  She worked for MLIC until January 1997, when she took another job.  *Id.* ¶ 2.  In or around October or November 2004, Weerasinghe reapplied to MLIC for a position as a sales manager.  *Id.* ¶ 3.  At the time, MLIC was seeking out former employees and inviting them to apply for positions with the company.  Pl.'s Rule 56.1 CounterStmt. ¶ 3.  Lance Gillman, who was working for MLIC in the Hauppauge office, had previously worked with Weerasinghe at Mutual of New York and recommended her to his office's Managing Director, Michael Tuccillo ("Tuccillo").  Gillman Decl. ¶ 4.  Gilman attests that Weerasinghe was a competent manager, very knowledgeable about insurance matters and warm and supportive of people she supervised.  *Id.* ¶ 2.  MLIC claims that, despite Gillman's recommendation, the company was skeptical about hiring Weerasinghe because it was

---

[2] "Local Rule 56.1(b) permits a 'non-movant to provide a separate statement, apart from th[e] paragraph-by-paragraph response' to the movant's statement required by subsection (a), 'in which it lists other facts [the non-movant] claims to be in dispute.'" *Allen v. Koenigsmann*, No. 23-CV-5651 (LAP), 2024 WL 403113, at *3 (S.D.N.Y. Feb. 2, 2024) (citing *Rodriguez v. Schneider*, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999), aff'd, 56 F. App'x 27 (2d Cir. 2003)).  "Local Rule 56.1 does not, however, provide for 'a responsive 56.1 Statement to include additional facts that are not in dispute but that a party opposing summary judgment simply thinks are important[.']" *Id.* (citing *Ostreicher v. Chase Bank USA, N.A.*, 2020 WL 6809059, at *1 n.1 (S.D.N.Y. Nov. 19, 2020)).  Many of the counterstatements submitted by the plaintiff present such additional.  Throughout the report, the Court has attempted to flush out instances where there are genuine disputes about the material facts.

unimpressed by her production as a sales representative during her first tenure with the company. Def.'s Rule 56.1 Stmt. ¶ 4.  Weerasinghe disputes this assertion.  Pl.'s Rule 56.1 CounterStmt. ¶ 4.  She claims her first stint with MLIC was very positive.  *Id.*

In any case, in December 2004, MLIC rehired Weerasinghe as a Financial Services Representative, holding the title of Agency Sales Director ("ASD"), for its Hauppauge office. Def.'s Rule 56.1 Stmt. ¶ 5.  The principal function of an ASD is to recruit sales representatives, also called financial services representatives or financial advisors, and to develop them into productive revenue generators.  *Id*. ¶ 79.  As such, Weerasinghe's job was to recruit and train new, less experienced advisors by, among other things, accompanying advisors to meetings with prospective clients.[3]  *Id*. ¶¶ 80, 81.  Weerasinghe states that ASDs were also required to supervise and to improve the performance of very experienced agents who were high producers. Pl.'s Rule 56.1 CounterStmt. ¶ 80.

In connection with her hiring, Weerasinghe was required to sign a document entitled "Appointment of Financial Services Representative ("the Appointment")," which set forth the terms and conditions of her employment with MLIC.  *Id*. ¶ 6.  As Weerasinghe correctly notes, the Appointment includes a number of terms concerning the way in which employees may sell insurance policies.  *See* Weerasinghe Decl. Ex. 15; Wargacki Decl. Ex. F.  More relevant to her job, the Appointment also makes clear that employees were required to transact business with MLIC or its designates through and subject to the general supervision and direction of the management of the sales office to which she was assigned.  *Id*.  In addition, the Appointment

---

[3] Generally, if an ASD directly recruits a candidate and that candidate is hired, the employee is assigned to the ASD's team.  Def.'s Rule 56.1 Stmt. ¶ 83.  If an ASD receives a referral from a member of the ASD's team, the candidate is also assigned to that ASD's team, if hired.  *Id.* ¶ 84.  If a firm chooses to have a Recruiting Director or recruiting staff, an ASD might also be assigned an advisor if the candidate is hired.  *Id.* ¶ 85.

provided that Weerasinghe would be paid in accordance with MLIC's Compensation Plan, which could be changed by MLIC from time to time. *Id.* The Appointment also clearly states that her employment was not guaranteed and could be terminated by MLIC at any time as long as she received written notice in person or by mail to her last known address. *Id.* Finally, the Appointment indicates that the terms and conditions of her employment, including the rules governing her compensation, could be changed only by an authorized officer of MLIC, in writing, and not by any representative of MLIC in any of its agencies or its designates in any of its agencies or regional offices. *Id.*

When Weerasinghe joined the Hauppauge office in 2005, she received a weekly management compensation payment (an "allowance") of approximately $1,730 per week, which equated to an annual allowance of $89,960. Def.'s Rule 56.1 Stmt. ¶ 11. In 2006, Tuccillo reduced Weerasinghe's weekly allowance to $1,530 per week, which equated to an annual allowance of $79,560. *Id.* ¶ 12. In 2007, Tuccillo reduced her weekly allowance to $1,200 per week, which equated to an annual allowance of $62,400. *Id.* ¶ 13. The reduction in pay between 2005 and 2007 is not at issue in this lawsuit.

### B.      Weerasinghe's Transfer to Queens

In 2007, Tuccillo asked Frank Scalese ("Scalese"), the Managing Director of MLIC's Roslyn and Queens offices, whether he would hire Weerasinghe at his firm.[4] *Id.* ¶ 14. MLIC contends that, at the time, Tuccillo was considering terminating Weerasinghe because he

---

[4] Scalese had joined MLIC in August 2005 to lead the Roslyn office and was also made the Managing Director of MLIC's Queens office. Def.'s Rule 56.1 Stmt. ¶ 37. Scalese's firm operated under the MLIC umbrella as the North Coast Financial Group, until he changed its name to Blue Ocean Wealth Solutions. *Id.* ¶ 38. Essentially, North Coast Financial Group (or later Blue Ocean Wealth Solution) was a financial services office selling insurance products, such as life insurance, disability insurance and long-term care insurance. *Id.* ¶ 39. It also sold some investment and financial planning products, such as 401(k)s, IRAs, and retirement plans and college funding. *Id.*

believed that she was not performing well as an ASD.  *Id.* ¶ 15.  Weerasinghe disputes this assertion.  Pl.'s Rule 56.1 CounterStmt. ¶ 15.  She claims that Tuccillo had not considered terminating her at any time.  *Id.*  In fact, she contends that Tuccillo recommended her to Scalese, for his office because of  his "high opinion of her as a manager and as a person." *Id.*  Interestingly, Tuccillo has submitted an affidavit that somewhat confirm Weerasinghe's contentions.  Tuccillo Decl. ¶ 7.  While he fails to mention what led to the reduction in her pay in both 2006 and 2007, he does state that Weerasinghe did well recruiting agents and he thought she could be successful in Queens.  *Id.* ¶ 8

Nevertheless, it is undisputed that Tuccillo suggested that Weerasinghe transfer to Scalese's office in Queens because she was finding it "very difficult to recruit" financial advisors for Hauppauge.  Def.'s Rule 56.1 Stmt. ¶ 17.  The parties suggest that Weerasinghe's natural market was in Queens and the other boroughs, which were closer to the Queens office.  *Id.* ¶ 19.  As such, in the summer of 2007, Scalese agreed to have Weerasinghe transferred to his Queens office.  *Id.* ¶ 24.

At the time of her transfer, Scalese reported to Michelle Pedigo ("Pedigo"), who was the Senior Vice President and Head of the Northeast Region of MLIC's Premier Client Group - MLIC's retail adviser force.  *Id.* ¶ 21.  According to Pedigo, she was surprised that Scalese had hired Weerasinghe as an ASD since it was her belief that Weerasinghe was not a high-performing sales manager and her production was not at the level that MLIC expected it to be.  *Id.* ¶ 22.  Although she does not dispute that Pedigo questioned the hiring, Weerasinghe avers that by the summer of 2008, Pedigo had a different impression of her.  Pl.'s Rule 56.1 CounterStmt. ¶ 22.  She recalls that while she was working for Scalese, Pedigo had even telephoned her and praised her success in increasing the number of her new agents who had

become Super Starters.  Weerasinghe Decl. ¶ 29.  In fact, Weerasinghe claims that, at some point, Pedigo had offered to transfer her to Scalese's main office in Roslyn but, at the time, Scalese had thought she might do better in Queens.[5]  Def.'s Rule 56.1 Stmt. ¶ 23.

## C.        The Roslyn Office, its ASDs and Subsequent Mergers

Notwithstanding the above, at some point in 2008, Weerasinghe was transferred to Scalese's Roslyn office where she worked for the remainder of her employment until she took an extended leave of absence beginning on or about May 7, 2012.[6]  *Id.* ¶ 25.  By the time she was transferred to Roslyn, Phillip Cebelenski ("Cebelenski") was already a sales manager at the office.  *Id.* ¶ 51.  In fact, he predated Scalese and was Scalese's first and longest serving ASD at MLIC.  *Id.* ¶¶ 51, 52. Notably, it is undisputed that Cebelenski was also among the most experienced ASDs at the firm and consistently had the highest or one of the highest producing teams.[7]  *Id.* ¶ 53.  Shari Amitrano ("Amitrano") also joined the firm in May 2008 as an ASD.  *Id.* ¶ 54.  Amitrano had prior sales experience selling similar insurance, investment and retirement planning, and other products.  *Id.*  Like Cebelenski, Amitrano was very successful and was ultimately promoted to Director of Education and Producer Development.  *Id.* ¶ 55.

In December 2009, MLIC's Garden City office merged with Scalese's Roslyn office.  *Id.* ¶ 56.  After the merger, Bing Cheng ("Cheng"), became the sales manager at Scalese's Garden City location.  *Id.* ¶ 57.  Cheng already had a team of advisors and they generally were based with him at the Garden City office.  *Id.* ¶ 57.  Cheng was a reliably successful ASD, consistently

---

[5] As Managing Director, Scalese had the discretion to decide what positions were hired into his firm.  Def.'s Rule 56.1 Stmt. ¶ 46.  Scalese also had discretion, consistent with an employee's terms of employment with MLIC, to define the responsibilities of a given position to suit the needs of the firm.  *Id.*
[6] Weerasinghe claims that the leave of absence, which ended her work in Scalese's office on May 7, 2012, was due to a disability.  Weerasinghe Decl. ¶ 42.
[7] At some point in 2011, Cebelenski transferred to the Garden City office.  *Id.* ¶ 63

6

meeting or substantially meeting all benchmarks and having one of the top producing teams at Scalese's firm.[8]  *Id.* ¶ 58.

Jennifer Clemans ("Clemans") also joined Scalese's firm as an ASD at the Garden City office.  *Id.* ¶ 60.  However, at some point, Scalese gave Clemans the option of stepping down as an ASD, in lieu of termination, because she was not adequately recruiting advisors and developing them into producers.  *Id.* ¶ 61.  In July 2011, Clemans stepped down from the ASD role and returned to her prior position as a field sales representative, until her resignation from MLIC in August 2011.  *Id.* ¶ 62.

In the meantime, in July 2010, MLIC's Melville office also merged with Scalese's firm. *Id.* ¶ 64.  As part of the Melville merger, Richard Meier ("Meier") joined Scalese's team as a newly appointed ASD.  *Id.* ¶ 65.  Prior to the merger, Meier served as the Melville office's Training Director.  *Id.* ¶ 66.  Scalese promoted Meier to the position of ASD in part because he needed a manager at the Melville location.  *Id.* ¶ 67.  Scalese also promoted Meier because Meier brought diversification of expertise to his firm.  *Id.* ¶ 68.  At the time, besides Cebelenski's team, much of the firm's advisors' experience centered on life insurance products.  *Id.* ¶ 69.  In contrast, Meier brought a decade of investment and wealth management experience, including having served as vice president at a sophisticated financial services firm.[9]  *Id.* ¶ 70.

After she joined Scalese's firm, Scalese increased Weerasinghe's weekly allowance for 2008 from $1,200 to $1,500, which was equivalent to an annual allowance of $78,000.  Def.'s

---

[8] Cheng, under a different Managing Director, was already receiving an annual allowance in the amount of $95,200 and incentive pay in the amount of $88,432 in connection with his employment in 2009.  Def.'s Rule 56.1 Stmt. ¶ 59.

[9] No other ASDs worked under Scalese from January 2010 until May 2012.  Def.'s Rule 56.1 Stmt. ¶ 71. Amitrano, Cheng, and Meier continue to work at Scalese's firm.  *Id.* ¶ 72.

Rule 56.1 Stmt. ¶ 26.  In 2009, Scalese increased Weerasinghe's weekly allowance from $1,500 to $1,600, which is equivalent to an annual allowance of $83,200.  *Id.* ¶ 27.  In 2010, Scalese increased Weerasinghe's weekly allowance from $1,600 to $1,900, which is equivalent to an annual allowance of $98,800.  *Id.* ¶ 28.

As an aside, Weerasinghe testified at her deposition that Scalese was happy she had joined his firm and she believed they were good friends.  *Id.* ¶¶ 31, 32.  She also testified that Scalese "treated [her] well" and she had no objection with the amount of her compensation when she first transferred to his Queens firm in 2007.  *Id*. ¶ 33.  She also acknowledges that, over the years, Scalese had increased her pay even though there had been no change to her responsibilities.  *Id*. ¶ 34.

**D.      Weerasinghe's Performance after Candito's Arrival**

Weerasinghe claims that her relationship with Scalese changed after he hired Nicholas Candito ("Candito") as the firm's Senior ASD.  *Id.* ¶ 35.  According to the record, Scalese hired Candito as a Senior ASD in the summer of 2010 to oversee the firm's ASDs because the firm had experienced significant growth.  *Id*. ¶ 73.  Candito had been a Managing Director of another MLIC office before he moved to Scalese's firm.  *Id*. ¶ 74.  After he was hired, Weerasinghe and the rest of the ASDs, with the exception of Cebelenski, reported to Candito for day-to-day issues relating to their jobs.[10] *Id*. ¶ 77.  MLIC claims that although Candito was the Senior ASD, he did not have a role in hiring or firing employees.  *Id*. ¶ 78.  Weerasinghe disputes this fact but only

---

[10] MLIC avers that before Candito was hired, Cebelenski had already functioned like a Senior ASD.  *Id*. ¶ 75. Weerasinghe disputes this fact.  Pl.'s Rule 56.1 CounterStmt. ¶ 75.  She claims that unlike Candito whose main responsibility was to supervise the ASDs, Cebelenski only supervised insurance agents.  *Id*. MLIC also contends that after Candito's arrival, Cebelenski continued to report Scalese because he had a long working relationship with Scalese, was an experienced ASD with an established team, and did not require as much day-to-day guidance as the other ASDs.  Def.'s Rule 56.1 Stmt. ¶ 76.  Weerasinghe disputes this assertion as well.  Pl.'s Rule 56.1 CounterStmt. ¶ 76.

because on several occasions, Candito told her she was going to be fired or replaced. Pl.'s Rule 56.1 CounterStmt. ¶ 78.

In any case, as noted above, Weerasinghe claims that the conditions of her employment changed after Candito became the Senior ASD. Def.'s Rule 56.1 Stmt. ¶ 35. By way of example, Weerasinghe complains that in October 2010, Scalese prepared a memorandum concerning her performance. Scalese Decl. Ex. G. The memorandum included a chart comparing the company's expectations to her actual performance:

|  | Planned Unit Production (GDCs) | Actual Unit Production (GDCs) | +/- |
|---|---|---|---|
| 1st Quarter, 2010 | $513,930 | $275,430 | ($238,500) |
| 2nd Quarter, 2010 | $1,027,884 | $579,614 | ($448,246) |
| 3rd Quarter, 2010 | $1,541,826 | $989,114 | ($552,712) |
| 4th Quarter, 2010 | $2,055,720 | - | - |

*Id*. When he gave her the memorandum, Scalese made clear that Weerasinghe's unit production had to meet or exceed the firm's goals.[11] *Id*. According to Weerasinghe, Scalese had even suggested that she step down from her ASD position into the insurance agent rank. Pl.'s Rule 56.1 CounterStmt. ¶ 35. She did not do so.

Weerasinghe also claims that, in early 2010, influenced by Candito, Scalese began to discriminate against her on the basis of her gender, race and color and to subject her to a working

---

[11] Managing Directors like Scalese designate a portion of the firm's production target to each ASD who, in turn, is responsible for ensuring his or her unit met the ASD's pro rata production target. Def.'s Rule 56.1 Stmt. ¶ 41. However, a variety of factors affect the allocation of GDC targets to an ASD. *Id*. ¶ 42. For example, a sales manager who is making $110,000 in total cash opportunity (i.e., allowance and incentive pay) needs to produce over 1.2 million of GDC in order to pay for themselves. Moy Decl. Ex. D, Pedigo Dep. 59:23-60:13, 64:3-17. Additionally, the size of the team, the relative seniority of an ASD's team (i.e., experienced agents were expected to write more business), the type of experience or specialized product expertise that existed on a team, etc., could influence the allocation of GDCs. Def.'s Rule 56.1 Stmt. ¶ 45.

environment that was hostile.  *Id.* ¶ 36.  Weerasinghe points to the fact that Scalese denied her incentive payments for all four quarters of 2010 despite the fact that the male ASD's received their incentive payments.  *Id.*  She also notes that by 2011, Scalese reduced her allowance and incentive opportunities from their prior levels.  *Id.*  Specifically, Scalese reduced Weerasinghe's 2011 weekly allowance from $1,900 to $1,700, which is equivalent to an annual allowance of $88,400.  Def.'s Rule 56.1 Stmt. ¶ 29.  He reduced her incentive opportunity from $24,700 to $21,600.  Pl.'s Rule 56.1 CounterStmt. ¶ 36.  Although she does not discuss her colleagues performance, Weerasinghe complains that no other ASD received a reduction of their allowance and incentive opportunity.  *Id.*  Moreover, Weerasinghe contends that for the fourth quarter of 2011, after Scalese's office won the title of most successful MLIC office in the United States, Scalese gave her $14,515 for her fourth quarter incentive payment while awarding about three times as much to Meier ($43,640), four times as much to Cheng ($56,400), and five times as much to Cebelenski ($72,000).  *Id.*

Weerasinghe further asserts that her relationship with Scalese became even worse in February 2010 after she helped two insurance agents complain to him about discrimination. Weerasinghe Decl. ¶¶ 30-34.  To this end, Weerasinghe avers that between 2010 and 2012, Scalese and Candito prevented her from recruiting agents/sales representatives by not allowing her to leave the office to engage in recruiting activities.  Pl.'s Rule 56.1 CounterStmt. ¶¶ 79, 83. She also says that Scalese interfered with her recruitment efforts by forcing her to stop using "Wall Street Jobs" as a source of referrals.  *Id.*  MLIC's explanation for her reduction in compensation is described in detail below.

E.    **The Assignment of Agents to Weerasinghe**

In addition, Weerasinghe claims that by September 2010, the manner in which Candito

was assigning her agents was discriminatory.  Pl.'s Add'l Rule 56.1 Facts ¶¶ 13, 14.  Although it is clear that recruiting financial advisors was a core function of ASDs, Scalese hired a Recruiting Director, Jacquelyn McDermott ("McDermott"), to supplement his ASDs efforts by independently sourcing recruits for the firm.  Def.'s Rule 56.1 Stmt. ¶ 47.  According to MLIC, after Scalese hired McDermott, Scalese was initially involved in the assignment of advisors that were recruited by McDermott but she later took over that entire function.  *Id*. ¶ 86.  MLIC further contends that Scalese and McDermott would both assign advisors to teams based on a number of factors, including, but not limited to, common background and/or shared expertise, personality, markets, and an advisor's request.  Def.'s Rule 56.1 Stmt. ¶ 87.

Weerasinghe alleges that after McDermott was hired, she along with Candito, assigned agents to her.  Pl.'s Rule 56.1 CounterStmt. ¶ 86.  MLIC counters that Candito was not involved in the recruitment process and never advised McDermott about how to assign agents.  *See* Weber Decl. Ex. D; McDermott Dep. 27:16- 29:9.  Indeed, MLIC claims that Scalese and McDermott, alone, were the only people at the firm who made decisions concerning to what "unit" financial advisors would be assigned.  Def.'s Rule 56.1 Stmt. ¶ 88.

Moreover, with respect to Weerasinghe's contentions, MLIC notes that, in 2010 and 2011, out of the financial advisors recruited by or referred to McDermott, she assigned Weerasinghe either the highest or second highest number of advisors.  *Id*. ¶ 91.  Specifically, MLIC claims that, in 2010, six financial advisors recruited by or referred to McDermott were assigned to Weerasinghe, six were assigned to Meier, five were assigned to Clemans and three were assigned to Cheng.[12]  *Id.* ¶ 92.  Weerasinghe has arrived at a different number based on her

---

[12] It is not clear how many were assigned to Amitrano.   Def.'s Rule 56.1 Stmt. ¶ 92.

11

"own internal records" and a document that suggests that of the "hires," she was assigned seven financial advisors, Amitrano was assigned one, Cheng was assigned four, Clemens was assigned nine, Cebelenski was assigned one, and Meier was assigned one or two. Weerasinghe Decl. Ex. 22.[13] In either case, it is clear she was given at least the second highest number of recruits.

MLIC further contends that the following year (2011), out of the financial advisors recruited by or referred to McDermott, five advisors were assigned to Weerasinghe, six advisors were assigned to Meier, one was assigned to Clemans and none were assigned to Cebelenski and Cheng. *Id.* ¶ 93. Again, Weerasinghe's recollection is different.[14] She believes that fourteen advisors recruited by McDermott were assigned to Meier, eight were assigned to her, seven were assigned to Cebelenski, three were assigned to Cheng, one was assigned to Clemans, and two were assigned to Scalese. Pl.'s Rule 56.1 CounterStmt. ¶ 93. She believes the disparity in assignments was caused by the fact that MLIC tried to match her race and color with the race and color of the prospective agent. Pl.'s Rule 56.1 CounterStmt. ¶ 87. Specifically, she claims that because she was the only ASD whose color was "brown," virtually all the agents assigned to her were people of color. *Id.* She says that, as a result, "very few agents" were assigned to her and, if they were assigned, unfortunately they were inexperienced and uncooperative. *Id.* Lastly, she complains that in 2010 and 2011, the agents weren't assigned to her until the end of the year. *Id.* ¶¶ 87, 88. She blames Candito for the timing of the assignments. *Id.*

Notwithstanding the above, it is important to note that Weerasinghe does not dispute that ASDs were not entitled to receive any agents from the firm and acknowledges that most firms

---

[13] Weerasinghe claims that Ex. 22 reflects that Meier was assigned 13 advisors and Clemans was assigned 9 advisors. Pl.'s Rule 56.1 CounterStmt. ¶ 92. The undersigned was unable to reconcile that calculation.

[14] Weerasinghe has created a list of the advisors assigned to her. See ECF no. 119-8 to 119-11. MLIC argues the evidence manufactured by Weerasinghe is inadmissible.

did not even have recruiting directors available to assist in that effort.  Def.'s Rule 56.1 Stmt. ¶¶ 89, 90.

### F.        MLIC's New Compensation Plan

To provide context for the parties' contentions, it is necessary to understand MLIC's compensation structure.  In January 2010, MLIC implemented a new compensation plan which departed from its prior compensation structure.  *Id*. ¶ 96.  At the time, MLIC sought to incentivize ASDs to recruit and develop productive financial advisors.  *Id*. ¶ 97.  As a result, its new policy tied ASD's compensation more closely to the ASD's production.  *Id.*  Prior to the change, it was possible for an ASD to be rewarded for recruiting many people even though the advisors they recruited did not become productive employees.  *Id*. ¶ 98.

In addition, from 2010 to 2012, a portion of total compensation was categorized as allowance, which was management compensation paid weekly.  *Id*. ¶ 99.  Other than a minimum weekly payment of $455.00, an allowance was not guaranteed, and the amount could be adjusted at any point to reflect the firm or an ASD's unit's performance.  *Id*. ¶ 100.  The other portion of total compensation was categorized as discretionary performance incentive pay.  *Id*. ¶ 101.  MLIC explains that incentive pay was based on an ASD's performance relative to the metrics established by the Managing Director for each ASD in an individualized business plan or Management Compensation Plan Target ("Plan Target").[15]  *Id*. ¶ 101.  Each of the Compensation Plans for 2010, 2011, and 2012 provided the following:

**<u>Basic Allowance</u>**

A management allowance is credited in the form of weekly management

---

[15] Weerasinghe disputes this assertion but only as it applies to her.  Pl.'s Rule 56.1 CounterStmt. ¶ 101.  As discussed in greater detail below, she avers that Scalese, in consultation with Candito, manipulated her Individual Objectives, Incentive Details, the amount of her Allowance, and her Discretionary Performance Incentive Pay, impacting her pay in 2010, 2011, and the first third of 2012.  *Id.*

allowance payments made during the year.  The weekly management allowance will not be less than $455 per week which constitutes a minimum salary. . ..

Management allowance amounts may be adjusted, upward or downward, during the year based on the firm's or unit's performance.  Factors include (but are not limited to):

• Year-to-date firm results against business plan objectives

• Progress toward achievement of the firm's or unit's annual first year GDC sales goal. . ..

**Discretionary Performance Incentive**

A manager's Discretionary Performance Incentive is based on performance in relation to achieving business plan objectives.  The opportunity to receive a Discretionary Performance Incentive ("Opportunity") is set as part of the compensation planning process each year and the payment of this Opportunity is at the Company's discretion and is based upon a manager's performance relative to the business plan. . ..

The factors used to determine a manager's performance include, but are not limited to:

• Meeting or exceeding business plan objectives

• Adherence to Compliance standards

• Sales

• Efficiency in utilization of company resources. . ..

Wargacki Decl. Ex. H, I, J.[16] Further, each Compensation Plan states: "[t]his plan supersedes all prior management compensation plans," MLIC "reserves the right to make changes unilaterally," and such changes may only be made "by the Company in writing." Def.'s Rule 56.1 Stmt. ¶ 104.

---

[16] Weerasinghe takes issue with the veracity of the assertion because of the dates of the plans.  Pl.'s Rule 56.1 CounterStmt. ¶ 103.  To be clear, the 2010 Management Compensation Plan was issued on March 29, 2010, but effects payroll from January 8, 2010 to December 31, 2010.  Wargacki Decl. Ex. H.  The 2011 Management Compensation Plan is dated October 7, 2011.  *Id*. Ex. I.  The 2012 plan is dared May 18, 2012.  *Id.* Ex. J. Nonetheless, Wargacki, who is an Assistant Vice President at MLIC, has attested that the documents provided to the Court were MLIC's compensation plans in effect for 2010, 2011, 2012.  *See* Wargacki Decl. ¶ 28.

Pursuant to its new compensation plan, MLIC directed Managing Directors like Scalese to establish a management compensation plan for each member and set discretionary incentive objectives. *Id.* ¶ 105. It also recommended that Managing Directors establish three to five objectives which could be aligned with a firm's business plan strategy and performance measures or based on daily activities and how the director obtained results. *Id.* The Management Compensation Plan Target form then identified the ASD's allowance, the benchmarks that the Managing Director established for each ASD and benchmarks to gauge the ASD's effectiveness in cultivating new sales representatives into productive agents. *Id*. ¶¶ 106, 109.

According to MLIC, this new approach was important because a sales representative needed to generate tens of thousands of Gross Dealer Concessions ("GDCs"), that is, revenues derived from the sale of a financial product, for MLIC to breakeven with the employment of that individual. *Id*. ¶¶ 107, 110. It was also understood that it could take several months for a new sales representative to start generating GDCs. *Id.* ¶ 111. Until the sales representatives reached the breakeven point, MLIC was essentially subsidizing those individuals because MLIC was paying weekly payments to new advisors before transitioning them into commission-based compensation. *Id*.

As a result, under the new plan, MLIC assessed an ASD's recruiting effectiveness by using a metric that gauged the GDCs of the sales representative recruited by ASDs relative to MLIC's investment in that individual (the "initial payment level" or "IPL"). *Id*. ¶ 112. Generally, the expectation was that the ratio would increase in favor of GDCs and the initial payment levels would decrease. *Id*. ¶ 113. Managing Directors also set other related goals for ASDs. *Id*. ¶ 114. For example, ASDs were expected to have a certain number of inexperienced

15

sales representatives generate threshold levels of GDCs by the end of a quarter or year. *Id*. ASDs were also expected to have a certain number of team members qualify for the Leaders Conference. *Id*. ¶ 115. Managing Directors also set goals for ASDs to have a certain percentage of team members meet benchmarks for sales representatives. *Id*. ¶ 116.

. For the purposes of assessing incentive compensation, MLIC's policy excluded an ASD's personal production, that is, business that the ASD personally contracted with a client. *Id*. ¶ 117. As Weerasinghe correctly notes, the policy is somewhat irrelevant because Scalese prohibited ASDs working at his firm from personally selling insurance policies. *Id*. ¶¶ 117-19. Nevertheless, the Management Compensation Plan Target also identified the potential total incentive pay that an ASD could receive in a given year, a portion of which an ASD was eligible to receive on a quarterly basis. *See* Wargacki Decl. Exs. H, I, J. Generally, from 2010 to 2012, an ASD was eligible to receive up to 20% of the potential total incentive pay for each of the first three quarters (totaling 60%) and 40% of potential total incentive pay for the fourth quarter. Def.'s Rule 56.1 Stmt. ¶ 122.

In addition, if an ASD received incentive pay less than the potential maximum for a given quarter, the ASD had the opportunity to make up for performance shortfalls and capture those unpaid sums in the following quarter. *Id*. ¶ 123. To this end, each quarter, the Managing Director would typically submit incentive pay recommendations based on his or her assessment of the firm's circumstances and an ASD's performance relative to the benchmarks set out in the Management Compensation Plan Target. *Id*. ¶ 124. In this case, Scalese submitted his incentive pay recommendations for his ASDs and other qualifying employees to Pedigo. *Id*. ¶ 126. Weerasinghe believes that Scalese did so in consultation with Candito. Pl.'s Rule 56.1 CounterStmt. ¶ 124. In any case, it is clear that the Plan Target stated, "allowance and incentive

16

amounts can be adjusted upward or downward during the year based on the firm's or unit's performance. Determinations concerning incentive compensation awards and the amount of such awards are made in the sole discretion of senior management." Def.'s Rule 56.1 Stmt. ¶ 125.

MLIC maintained production reports that tracked metrics for each ASD's unit and each member of that unit. *Id.* ¶ 127. Some of the underlying metrics contained in the reports reflected data points used to assess ASD's performance but did not necessarily reflect the goals set in the Management Compensation Plans. *Id.* For example, an invitation to attend MLIC's Leaders Conference, which was extended to sales representatives whose production met one of several tiers, was not a component of compensation. *Id.* ¶ 128. Notably, MLIC claims that ASDs themselves, at the time, did not qualify for the Leaders Conference based on the production of their sales representatives. *Id.* ¶ 129. Weerasinghe contends, however, that there were other ways to get invited to the Leaders Conference or a higher-level conference. Pl.'s Rule 56.1 CounterStmt. ¶ 129. For instance, she claims that she was simply invited by Tuccillo to the Leaders Conferences held in 2006 and 2007. *Id.* As such, she claims that based on the performance of the agents who reported to her in 2009, 2010, and 2011, she should have been invited to the Leaders Conferences but was left out of the conference despite the fact that all the other ASDs in the office attended. *Id.*

Lastly, with respect to compensation and benefits, some firms held quarterly events or contests for financial advisors with prizes for qualifiers but this was not a component of a financial advisor's compensation. Def.'s Rule 56.1 Stmt ¶ 132. In addition, MLIC notes that it awarded no extra bonus to a Managing Director or his/her firm for being recognized as the firm of the year. *Id.* ¶ 130. To this end, MLIC awarded no extra bonus to Scalese or to his firm for being recognized as firm of the year in 2011. *Id.* ¶ 131.

17

### G.  Scalese's Annual Benchmarks and Bonus Recommendations

Based on the above guidelines. for 2010, 2011, and 2012, Scalese set the following

Allowance and Incentive Opportunity for each of the ASDs in their respective Plan Targets:

| | Plan Target Allowance ($) | Plan Target Incentive Opportunity ($) | Plan Target Total Cash Opportunity ($) |
|---|---|---|---|
| **2010** | | | |
| Shari Amitrano | 130,000 | 50,000 | 180,000 |
| Phillip Cebelenski | 130,000 | 70,000 | 200,000 |
| Bing Cheng | 104,000 | 50,000 | 154,000 |
| Jennifer Clemans | 75,000 | 25,000 | 100,000 |
| Richard Meier[2] | 68,000 | 30,000 | 98,000 |
| Shanthi Weerasinghe | 98,800 | 24,700 | 123,500 |
| **2011** | | | |
| Phillip Cebelenski | 130,000 | 70,000 | 200,000 |
| Bing Cheng | 104,000 | 56,000 | 160,000 |
| Jennifer Clemans | 75,000 | 25,000 | 100,000 |
| Richard Meier | 88,400 | 21,600 | 110,000 |
| Shanthi Weerasinghe | 88,400 | 21,600 | 110,000 |
| **2012** | | | |
| Phillip Cebelenski | 130,000 | 70,000 | 200,000 |
| Bing Cheng | 104,000 | 56,000 | 160,000 |
| Richard Meier | 88,400 | 30,000 | 118,400 |
| Shanthi Weerasinghe | 88,400 | 21,600 | 110,000 |

18

*Id.* ¶ 133.  Scalese claims he, alone, determined his ASD's allowances and incentive pay opportunities set out in the Plan Targets and made the decisions concerning how much incentive compensation ASDs should be paid each quarter.  *Id*. ¶ 134.  Weerasinghe believes that Scalese "consulted with" Candito as to her pay.  Pl.'s Rule 56.1 CounterStmt. ¶ 133.

Although the GDC target was not the only factor in the determination of compensation, an ASD's attainment of his or her GDC benchmark was a substantial consideration when Scalese decided what amount or proportion of an ASD's incentive pay opportunity the ASD should receive.  Def.'s Rule 56.1 Stmt. ¶ 135.  Scalese also set other benchmarks pursuant to the company's compensation policy.  *Id*. ¶ 136.  Some of these benchmarks were designed to gauge an ASD's effectiveness, such as the ASD's ability to recruit financial advisors, increase advisors' GDC production (particularly with respect to new or inexperienced hires), and enhance his or her unit's profitability.  *Id.*  Scalese also set benchmarks based on other substantive functions of an ASD, such as sourcing business opportunities for newer financial advisors or attending client meetings with team members to train them.[17]  *Id*. ¶ 137.  For example, Scalese wanted Weerasinghe to work with some of the firm's top producers to develop the newer advisors on her team.  *Id*. ¶ 138.

Similarly, other benchmarks set by Scalese were based on the qualities of an ASD or an ASD's team.  *Id*. ¶ 138.  At times, Scalese tasked an ASD having unique experience with training employees or leading presentations to diversify the firm's experience with certain products or industries.  *Id.* ¶ 139.  For example, Scalese leveraged Meier's investment

---

[17] Weerasinghe does not dispute this fact but does note, once again, that Candito prevented her from attending client meetings/sales calls and directed her not to recruit financial agents or to pay to obtain referrals to licensed, experienced financial agents from Wall Street Jobs.  Pl.'s Rule 56.1 CounterStmt. ¶ 137.

background and directed him, in his Plan Target, to conduct training classes for the firms'

advisors on investments and wealth management to enhance the firm's advisor's capabilities in

other product areas. *Id.* ¶ 140. He did so because, at the time, the firm had a significant focus on

life insurance products. *Id.* Scalese also set firm citizen-related goals, such as performing

Virtual Job Tryout ("VJT") assessments, which are simulations to evaluate a candidate's

potential suitability for a financial advisor position at the firm. *Id.* ¶ 141. Finally, due to the

substantial growth of Scalese's firm, when recommending incentive pay, Scalese also considered

when his ASD's were tasked with working in different locations to fill an experience gap or

provide leadership. *Id.* ¶ 142.

With these considerations in mind, after the close of each quarter from 2010 to 2012,

Scalese provided Pedigo with his incentive pay recommendations. *Id.* ¶ 143. Pedigo either

approved or modified the amounts. *Id.* ¶ 144. Based on his recommendation, for 2010, 2011,

and 2012, the ASDs at Scalese's firm were paid the following allowance and incentive

compensation:

| | Allowance Paid ($) | Q1 Incentive Paid ($) | Q2 Incentive Paid ($) | Q3 Incentive Paid ($) | Q4 Incentive Paid ($) | Total Compensation ($) |
|---|---|---|---|---|---|---|
| **2010** | | | | | | |
| Shari Amitrano | 117,500 | 10,000 | 10,000 | 7,500 | 27,500 | 172,500 |
| Phillip Cebelenski | 130,000 | 10,000 | 10,000 | 10,500 | 49,500 | 210,000 |
| Bing Cheng | 104,000 | 10,000 | 7,000 | 7,500 | 30,500 | 159,000 |
| Jennifer Clemans | 75,036 | 2,000 | 0 | 0 | 0 | 77,036 |

| | | | | | |
|---|---|---|---|---|---|
| Richard Meier | 68,150 | 2,000 | 4,000 | 4,500 | 12,500 | 91,150 |
| Shanthi Weerasinghe | 98,800 | 0 | 0 | 0 | 0 | 98,800 |
| **2011** | | | | | | |
| Phillip Cebelenski | 130,000 | 14,000 | 10,500 | 12,000 | 72,000 | 238,500 |
| Bing Cheng | 104,000 | 10,000 | 8,400 | 11,200 | 56,400 | 190,000 |
| Jennifer Clemans | 40,404[3] | | | | | |
| Richard Meier | 87,150 | 4,320 | 3240 | 5,400 | 43,640 | 143,750 |
| Shanthi Weerasinghe | 89,400 | 2,160 | 1,080 | 1,080 | 14,515 | 108,235 |
| **2012** | | | | | | |
| Phillip Cebelenski | 130,000 | 10,500 | 14,000 | 14,000 | 0 | 168,500 |
| Bing Cheng | 104,000 | 9128 | 11,200 | 11,200 | 22,600 | 158,128 |
| Richard Meier | 88,400 | 5,950 | 7000 | 8050 | 0 | 109,400 |
| Shanthi Weerasinghe | 39,100[4] | 2,400 | 0 | | | |

*Id.* ¶ 145.

### H.    **Weerasinghe's Productivity and Pay between 2010 and 2012**

In 2010, Weerasinghe was given a GDC benchmark of 2,055,720 GDCs. *Id.* ¶ 146.

Weerasinghe does not dispute this fact but notes that she was given a higher benchmark than

Shari Amitrano. Pl.'s Rule 56.1 CounterStmt. ¶ 146. As previously noted, for the first quarter of

2010, Weerasinghe missed her target GDC by 238,500 GDCs. Def.'s Rule 56.1 Stmt. ¶ 147.

For the second quarter of 2010, Weerasinghe missed her target GDC by 448,246 GDCs. *Id.* ¶

148.  For the third quarter of 2010, Weerasinghe missed her target GDC by 552,712 GDCs.  *Id.* ¶

149.  Scalese attests that he prepared the performance memorandum discussed above because she had missed her GDC target each of the first three quarters in 2010,  *Id.* ¶ 150.[18]

By the close of the fourth quarter of 2010, Weerasinghe achieved approximately 1.53 million GDCs, which was approximately 25% below her annual GDC target.  *Id.* ¶ 151. According to MLIC, this is why Scalese reduced her annual allowance by $10,400 for 2011.  *Id.* ¶¶ 28, 29.  In comparison, in 2010, Weerasinghe's male colleagues, Cebelenski and Cheng, both had good years.  *Id.* ¶¶ 171, 173.  Weerasinghe's female colleague, Clemans, who also failed to meet her benchmarks, did not receive any incentive pay.  *Id*. ¶ 174.  In fact, as previously noted, Clemans was given the option of stepping down from the ASD position and returning to the financial advisor position, in lieu of termination*.*  *Id.* ¶ 175.

In 2011, Weerasinghe was given a GDC benchmark of 2,705,720.  Def.'s Rule 56.1 Stmt. ¶ 165.  Weerasinghe also missed her 2011 benchmark, generating only 2,341,594 GDCs.  *Id*. ¶ 166.  Weerasinghe did improve minimally in the first, second, and third quarters of 2011, but continued to miss GDC and other benchmarks.  *Id.* ¶ 176.  According to Scalese, for that reason, each quarter 2011, he recommended payment of only a portion of her potential incentive opportunity available to her.  *Id.*  For example, MLIC claims that Weerasinghe received $2,160 in incentive pay in the first quarter of 2011, because she hit two of her benchmark goals, including screening candidates' suitability for work as a financial advisor.  *Id.* ¶ 178. Weerasinghe claims she actually hit three, not two, benchmarks during that period.  Pl.'s Rule 56.1 CounterStmt. ¶ 178.

---

[18] MLIC has referred to the performance memorandum as the October 2020 memorandum a number of times.  The memorandum, which is annexed to Scalese Declaration as Exhibit G, is dated October 12, 2010.

In contrast, it is undisputed that during the same time period, Scalese recommended higher incentive pay for the other ASDs because they met or substantially met their benchmarks and provided other contributions that Weerasinghe did not provide to the firm.  Def.'s Rule 56.1 Stmt. ¶ 177.   For example, out of the potential incentive opportunity available to him in the first quarter of 2011, Cebelenski received $14,000 because of  the "continued momentum" in the Garden City office which he was helping to lead.  *Id.* ¶ 179.  Cheng received $10,000 because he was on target for getting two of his advisors to qualify for the Leaders Conference and he achieved his benchmark goals.  *Id.*  Meier received $4,320 because he hit his GDC goal and was also on track with getting his inexperienced advisors to qualify for the Leaders Conference.

In the second quarter of 2011, MLIC claims Weerasinghe received $1,080 in incentive payments because the only achievement she hit was the "VJT goal." *Id*. ¶ 180.  In addition, in 2011, five experienced advisors on Weerasinghe's team - Cicchetti, Ramdhani, Saha, and Tom - generated $1,606,796 of the $2,705,720 GDCs.  *Id.* ¶ 167.  That year, Tom and Cicchetti did qualify for the President's Conference and three of Weerasinghe's agents qualified for the Leaders Conference.  Pl.'s Rule 56.1 CounterStmt. ¶ 168.  However, a significant portion of Weerasinghe's GDCs were not generated until the fourth quarter.  Def.'s Rule 56.1 Stmt. ¶ 169.

In comparison, Cebelenski received $10,500 because of "continued momentum" in the Garden City Location.  *Id*. ¶ 181.  Cheng received $8,400 because he hit his target for getting advisors of certain experience to achieve certain benchmarks, was on track with getting inexperienced advisors to qualify for the Leaders Conference and met his VJT goal.  *Id.*  Meier received $3,240 because he hit his GDC goal and goal for getting advisors of certain experience to achieve certain benchmarks, as well as for being on track with getting inexperienced advisors to qualify for the Leaders Conference.  *Id.*

23

In the third quarter of 2011, Weerasinghe received $1,080 in incentive payments because she displayed "minor progress." *Id* ¶ 182. According to Scalese, Pedigo actually thought that his bonus recommendation was too high for Weerasinghe that quarter given her performance history but she let him decide whether to keep or reduce her incentive pay. *Id*. ¶ 183. By contrast, out of the potential incentive opportunity available to him that quarter, Cebelenski received $12,000 because Scalese thought he was doing a "great job" at the Garden City location and his base reps increased by fifteen percent. *Id*. ¶ 184. Cheng received $11,200 because he was on target relative to the Plan Target and was considered an "inspiration in [the] office." *Id*. Similarly, Meier received $5,400 because he performed exceptionally that quarter. *Id*.

For the fourth quarter of 2011, Weerasinghe received incentive payment in the amount of $14,515, because of the significant progress she made that quarter. *Id*. ¶ 185. Notably, she had achieved three out of four business plan objectives and "finished 84% of the GDC Plan. *Id.* Therefore, she was paid 84% of her Business Opportunity. *Id*. While not specifically disputing the amount she received, Weerasinghe does insists that MLIC applied a different standard to her than it applied to her male and Caucasian colleague and believes she achieved 86%. Pl.'s Rule 56.1 CounterStmt. ¶ 185. For example, she claims that while MLIC used the percentage of her GDC target achieved to determine her pay at the end of 2011, Cebelenski who also achieved approximately 84% of his target GDC received a higher Total Cash Opportunity. *Id.* Specifically, Weerasinghe claims that for the same period, she received 86.7% of her Total Cash Opportunity whereas Cebelenski received 119% of his. *Id*. In other words, she argues that the failure to completely meet her target GDC was considered when MLIC reduced her incentive pay, but that factor was ignored when they determined Cebelenski's pay. *Id*.

MLIC explains that for the fourth quarter of 2011, Cebelenski received $72,000 out of the

potential Total Cash Opportunity available to him because 22 out of 39 employees who qualified for the Leaders Conference came from the Garden City office that he was overseeing; he had 4 new advisors who qualified for the Leaders Conference, and his GDC was up 15% despite transferring to an office to provide leadership.  Def.'s Rule 56.1 Stmt. ¶ 186.  Similarly, it claims that Cheng received $56,400 for providing "tremendous [support for] Garden City," and hitting all business planning objectives.  *Id*.  Meier received $43,640 because he exceeded all business planning objectives and, in his first year as an ASD, had two financial advisors qualify for the Leaders Conference.  *Id.*

Despite underperforming, Weerasinghe's allowance and incentive opportunity remained the same for 2012.  *Id.* ¶ 170.  Weerasinghe saw similar earnings during the first quarter of 2012.  Specifically, she received $2,400 in incentive payments because she met 60% of her GDC goal and was on track for 50% of her benchmarks.  *Id.* ¶ 187.  In comparison, Cebelenski received $10,500 because he "[c]ontinued to do a great job in the detached location and outstanding work in the field."  *Id.* ¶ 188.  Cheng received $9,128 because he hit 93% of his GDC goal and 72% of his benchmarks.  *Id*.  Meier received $5,950 because he hit 70% of his GDC goal and 56% of his benchmarks.  *Id*.  In sum, it appears several of Weerasinghe's colleagues were outperforming her.

That said, the parties dispute what factors led to Weerasinghe missing her target goals.  They also dispute how to evaluate the results she had achieved.  To this end, MLIC argues that when Weerasinghe joined the firm, she was assigned Cicchetti, Ramnarine Ramdhani ("Ramdhani"), Paresh Saha ("Saha"), and Eric Tom ("Tom"), all of whom were already experienced, successful financial advisors.  *Id.* ¶ 152. MLIC further asserts that Cicchetti, Ramdhani, Saha, and Tom generated about $1,246,477 GDCs, representing approximately 83%

of Weerasinghe's 2010 GDC target. *Id.* ¶ 153. In addition, MLIC notes that while Cicchetti, Ramdhani, Saha, and Tom qualified for the Leaders Conference in 2010, Scalese did not factor that qualification into Weerasinghe's incentive compensation because they were all experienced advisors who were already among the top producers at his firm before he assigned them to Weerasinghe. *Id.* ¶ 154. In other words, Scalese did not believe that she had contributed to their success. *Id.*

Weerasinghe offers that she was only assigned Cichetti, Ramdhani, Saha and Tom in 2008 after she moved to the Roslyn office. Pl.'s Rule 56.1 CounterStmt. ¶ 152. However, there is no dispute that the agents were already assigned to her in 2010 – the first year she takes issue with her compensation. In addition, Weerasinghe avers that MLIC miscalculated the percentage of the GDC applicable to those five agents. *Id.* ¶ 153. She believes that the combined GDC of the five agents was 60.63% of her 2010 GDC target of 2,055,720. *Id.* As such, she argues that the percentage of GDC generated by her high producers was a much smaller percentage than the 83% claimed by MLIC. *Id.* Finally, Weerasinghe generally asserts that she contributed to her high performers' success. *Id.* ¶ 154.

MLIC also reiterates that Weerasinghe's job was to recruit and develop inexperienced advisors into successful producers, which she did not do. Def.'s Rule 56.1 Stmt. ¶ 155. In fact, the newer advisors who were able to generate GDC, like James Alex ("Alex"), Jocelyn Andres ("Andres"), Richard Baptiste ("Baptiste"), and Amit Sur ("Sur"), had been recruited by McDermott or referred to the firm and then assigned to her. *Id.* ¶ 156. Moreover, MLIC claims that only a portion of the GDC generated in the applicable years was attributed to those inexperienced advisors and even a smaller portion of the GDC generated, if any, was attributable to individuals that Weerasinghe independently had recruited. *Id.* ¶ 157. In sum, MLIC argues

26

that during the years at issue, Weerasinghe was not bringing in new producers and struggled to adequately nurture inexperienced or newer advisors so that they could generate new revenue for her unit and the firm. *Id.* ¶ 158. Weerasinghe disputes this claim, arguing that she "was very successful developing inexperienced agents" including 11 agents who achieved SuperStarter status. Pl.'s Rule 56.1 CounterStmt. ¶ 155. MLIC counters that the 11 agents she is referring to achieved SuperStarter status in 2009 but failed to meet their goals in 2010 and 2011 – the years at issue in this suit. Def.'s Reply to Rule 56.1 CounterStmt. ¶ 155.

Weerasinghe offers a further explanation for missing these target goals. She says that until 2010, Scalese permitted her to recruit, and she often went out to recruiting events with McDermott. Pl.'s Rule 56.1 CounterStmt. ¶ 155. She explains that, in January 2010, after her leave due to her broken tuberosity, Scalese told her to concentrate on training the inexperienced members of her team to become productive agents rather than working on recruiting new agents. *Id.* She also repeats that prior to 2010, she paid for and used Wall Street Jobs for referrals, but, in 2010, Scalese insisted that she stop paying for the website impacting her ability to recruit. *Id.* Finally, Weerasinghe alleges that Candito would not let her leave the office to recruit. *Id*.

In addition to the above, MLIC highlights the fact that Weerasinghe's GDC production was considerably impacted by the departure of two advisors assigned to her during the relevant time period. Def.'s Rule 56.1 Stmt. ¶ 159. To this end, MLIC notes that in addition to losing production potential from the two advisors, their departure led to a negative reversal of business that MLIC credited against Scalese's firm and ultimately against Weerasinghe's unit, which led to a reduction against her unit's GDC tally. *Id.* ¶ 161. In fact, MLIC claims that it had advanced commissions to the advisors on policies that the advisors had placed under certain assumptions about the duration of the policies. *Id.* ¶ 162. When the policies lapsed following the agents

departure, along with the incoming revenue, MLIC pulled back the commission from Scalese's firm and from those producers who were associated with Weerasinghe's unit.  *Id.*  Finally, MLIC asserts that Weerasinghe also had conflicts with team members.  Def.'s Rule 56.1 Stmt. ¶ 160.

Weerasinghe acknowledges that two agents assigned to her left MLIC and took some of their clients to their new insurance company, causing a reduction of her team's GDC.  Pl.'s Rule 56.1 CounterStmt. ¶ 159.  But she adds that the two agents who left, Moustaque Choudhury ("Choudhury") and Shahrouz Tourabi ("Tourabi"), had complained to Scalese about discrimination before they left.[19]  *Id.;* Pl.'s Add'l Rule 56.1 Stmt. ¶ 12.  Weerasinghe also disputes the claim that she had conflicts with team members as being too generalized.  Pl.'s Rule 56.1 CounterStmt. ¶ 160.  Indeed, she says there is only evidence that one person, Dawn McCarthy, had made a complaint against her.  *Id.*

## I.        Weerasinghe's Leave of Absence and Claim that her Property was not Returned

Weerasinghe did not receive incentive pay compensation for the second quarter of 2012 because she left on a leave of absence in May 2012.  *Id.* ¶¶ 189, 191.  Scalese maintained her office for her as he expected her to return to work.  *Id.* ¶ 192.  In fact, Scalese did not assign her office to another employee for over a year until it became clear she would not be returning.  *Id.* ¶ 193.  While the parties dispute who was assigned to pack up her office, it is clear that Scalese directed an employee to pack up Weerasinghe's belongings after it became clear she would not be coming back.  *Id.* ¶ 194.[20]  However, the parties do not dispute that Chan, who was friendly with Weerasinghe, delivered boxes of her belongings to her home.  *Id.* ¶ 196.  Weerasinghe

---

[19] Scalese testified at his deposition that he never received any complaints of discrimination from either Choudhury or Tourabi. Scalese Dep. 185:16-25, 186:9-187:14, 191:21-23.
[20] Weerasinghe alleges that Candito would not permit staff to pack the entire office so some items remained.  Pl.'s Rule 56.1 CounterStmt. ¶ 195.

explains that, at the time, she was taking twenty-four different medications and was too sick and weak to retrieve her own belongings.  Pl.'s Rule 56.1 CounterStmt. ¶¶ 197, 198.

In any case, Weerasinghe alleges that, upon receipt of the items from Chan, she called Scalese and complained that many of her personal items and documents were missing like her son's high school diploma and personal records of achievement.  *Id*. ¶¶ 199, 200.  She appears to blame Candito for the missing documents despite the fact that she acknowledges asking Chan to sort through her files and decipher what items were "personal." Def.'s Rule 56.1 Stmt. ¶ 200.  In fact, it is undisputed that Scalese did not refuse any requests for the return of personal files.  *Id*. ¶ 201.  Nor did Weerasinghe ever return to the office to retrieve her alleged missing belongings.  *Id*. ¶¶ 203.

### J.    Weerasinghe's Separation of Employment

Weerasinghe's employment with MLIC formally ended on or about November 11, 2014.  *Id*. ¶ 204.  She claims MLIC unilaterally terminated her employment.  Pl.'s Rule 56.1 CounterStmt. ¶ 204.   However, it is clear from the record that Weerasinghe's employment with MLIC was terminated after she had been on an extended leave of absence for over two years.  Def.'s Reply to Pl.'s Rule 56.1 CounterStmt. ¶ 204.  In fact, despite her contention, Weerasinghe testified at her deposition that she has never been terminated from any position.  *Id.*

### K.    The Parties' Contentions

To summarize, Weerasinghe contends that she was paid less than male ASDs and ASDs of "the Caucasian race," "White color" and "Chinese Light color." Pl.'s Add'l Rule 56.1 Stmt. ¶¶ 1, 2.  Weerasinghe also contends that Scalese, in consultation with Candito, manipulated her Individual Objectives, Incentive Details, the amount of her Allowance, and her Discretionary Performance Incentive Pay, so that she would suffer pay discrimination.  *Id.* ¶ 3.  In addition, she

29

claims that Scalese and Candito treated her differently and more harshly in the workplace than other ASDs and Scalese retaliated against her for helping two agents complain of discrimination, for complaining that Candito was assigning agents to her discriminatorily, and for complaining that depriving Baptiste of his valuable VPL opportunity was discriminatory. Weerasinghe Decl. ¶ 40(b); Pl.'s Add'l Rule 56.1 Stmt. ¶ 15. Finally, Weerasinghe complains that MLIC failed to return her personal belongings and documents after she left the office. Pl.'s Rule 56.1 CounterStmt. ¶¶ 199-202.

MLIC disputes these contentions. It argues that Weerasinghe's compensation was decreased because she underperformed all other ASDs from 2010 to 2012, except for Clemens. Def.'s Rule 56.1 Stmt. ¶ 171. It further asserts that the three ASDs to whom Weerasinghe has compared herself - Cebelenski, Cheng and Meier- all had bigger production targets, different teams, and different experience. Def.'s Reply to Pl.'s Add'l Rule 56.1 Stmt. ¶ 1. In short, MLIC argues that Weerasinghe was paid less because she consistently missed production targets and was not satisfying other benchmarks. Def.'s Reply to Pl.'s Add'l Rule 56.1 Stmt. ¶ 2. Lastly, MLIC disputes Weerasinghe's contentions concerning Candito's treatment, the hostile work environment, the alleged retaliation and the failure to return her belongings, noting that her allegations are based on a self-serving declaration lacking any evidentiary support.

## DISCUSSION

### A.    Summary Judgment Standards

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Puglisi v. Town of Hempstead*, No. 10 CV 1928, 2012 WL 4172010, *6 (E.D.N.Y. Sept. 17, 2012) (quoting *In re Blackwood Assocs., L.L.P.,* 153 F.3d 61, 67 (2d Cir. 1998) and citing *Celotex*

30

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)).  In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party.  *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998).  If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable.  *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996), *cert denied*, 520 U.S. 1228 (1997).

The trial court's responsibility is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994).  When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[T]here must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim."  *Jamaica Ash & Rubbish v. Ferguson*, 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *Celotex,* 477 U.S. at 322).  As such, a moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case.  In other words, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

However, "[t]he Second Circuit has 'explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment [in employment discrimination cases]

because the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication.'" *Greenberg v. State Univ. Hosp.-Downstate Med. Ctr.*, No. 15 CV 2343 PKC VMS, 2019 U.S. Dist. LEXIS 167956, 2019 WL 4752018, at *13 (E.D.N.Y. Sept. 29, 2019)(citing *Thompson v. Kaufman's Bakery, Inc.,* No. 03-CV-340 (WMS), 2005 U.S. Dist. LEXIS 22431, 2005 WL 643433, at *3 (W.D.N.Y. March 16, 2005)). Nevertheless, "summary judgment remains appropriate in discrimination cases, as 'the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation.'" *Singh v. New York State Dep't of Taxation & Fin.,* 911 F. Supp. 2d 223, 233 (W.D.N.Y. 2012) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

### B.    Weerasinghe's Section 1981 Claim

As noted above, in her second amended complaint, Weerasinghe added a fourth cause of action under 42. U.S.C. § 1981.  ECF No. 1-3.  Specifically, she alleges that she was discriminated against on the basis of her race and color, subjected to a hostile work environment, and retaliated against for complaining of discrimination.  The Court will address each branch of Weerasinghe's federal claim in turn.

### 1.    Wage Discrimination

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. County of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004); 42 U.S.C. § 1981(a).  In contrast to other discrimination statutes (*e.g.*, 42 U.S.C. § 2000e-2(a)(1)), Section 1981 is more limited, proscribing only race based discrimination.  *See Gordon-Mallett v. Mount Sinai Hosps. Grp., Inc.*, No. 22-CV-1159 (LJL), 2024 WL 1513910, at *9 (S.D.N.Y. Apr. 8, 2024).  But the

32

prohibition against racial discrimination does encompass discrimination based on ancestry or ethnic characteristics. *See Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) (citing *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613, 107 S. Ct. 2022, 95 L. Ed. 2d 582 (1987)).

### a. Direct Evidence of Discrimination

Courts generally apply the *McDonnell Douglas* burden-shifting analysis to discrimination claims to assure that a plaintiff has his or her day in court despite the unavailability of direct evidence. *Short v. Manhattan Apartments, Inc.,* 916 F. Supp. 2d 375, 396 (S.D.N.Y. 2012) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).  However, the *McDonnell Douglas* test is "inapplicable" where the plaintiff presents direct evidence of discrimination.  *Ames v. Ohio Dep't of Youth Servs*., 605 U.S. 303, 321, 145 S. Ct. 1540, 1552, 221 L. Ed. 2d 929 (2025) (citing *Trans World Airlines, Inc*., 469 U.S. at 121).  Accordingly, in this case, the Court must begin its analysis by determining whether Weerasinghe has presented the type of evidence needed to circumvent the *McDonnell Douglas* framework.

Weerasinghe has proffered several examples of Scalese and Candito's alleged racial animus in her additional facts.  Specifically, she alleges:

1.     At monthly management team meetings chaired by Scalese, Candito intentionally seated himself only next to Caucasian and White members of the management team or next to Bing Cheng who was Chinese and Light skinned and did not sit next to Weerasinghe, who is of the South Asian race and Brown color or Aida Nema ("Nema"), who is of Egyptian descent.

2.     Every week, Candito, the Senior ASD and Weerasinghe's immediate supervisor, met in one-on-one meetings with each of the ASDs of Caucasian race and White color and with the ASD who is of Chinese descent and Light color, but he refused to meet with her.

3.     Candito did not have lunch with Weerasinghe, although he frequently had lunch with one or more of the ASDs who are of Caucasian race and White color and/or with the ASD who is of Chinese descent and Light skinned.

4.     At the January 2012 annual management team meeting, Candito commented, in reference to people from Pakistan and Sri Lanka, "All these fucking people come to America to take our money and run."

5.     Scalese referred to two of Weerasinghe's agents, who are of Brown color, as "the terrorists."

Pl.'s Add'l Rule 56.1 Stmt. ¶¶ 8-11.  This "direct evidence" is insufficient to circumvent the *McDonnell Douglas* framework or a number of reasons.

To begin with, the comments allegedly made by Scalese and Candito, although inappropriate, are not probative of MLIC's motive for discussing Weerasinghe's performance or determining her pay.  *See Shepherd v. BCBG Max Azria Grp., Inc.,* No. 11 CIV. 7634 RJS AJP, 2012 WL 4832883, at *17 (S.D.N.Y. Oct. 11, 2012), report and recommendation adopted *sub nom. Shepherd v. Azria,* No. 11 CIV. 7634 RJS/AJP, 2012 WL 6150854 (S.D.N.Y. Dec. 10, 2012) (citing *Dixon v. Int'l Fed'n of Accountants*, 09 Civ. 2839, 2010 WL 1424007 at *4 (S.D.N.Y. Apr. 9, 2010) (co-worker's comment at a meeting that "she can't believe that [defendant] could hire a black Jamaican woman at 48 years of age" held to be "at best ambiguous as to whether it met the test for discriminatory animus."); *see also Renz v. Grey Adver., Inc.* 135 F.3d 217, 224 (2d Cir. 1997) ("granting summary judgment to employer because plaintiff's sole evidence of discrimination consisted of isolated remarks by decision-maker that, although inappropriate, were not directed at plaintiff'); *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05 CIV. 5109 (JCF), 2007 WL 1149979, at *9 (S.D.N.Y. Apr. 18, 2007), aff'd sub nom. *Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943 (2d Cir. 2008) (citing *Bozeman v. Per-Se Technologies, Inc.,* 456 F.Supp.2d 1282, 1346 (N.D. Ga. 2006) (noting that even if "shunning" by co-workers and supervisors was actionable, plaintiff failed to establish that he was shunned or ostracized because of protected activity, rather than "some

34

lawful factor, such as his co-workers['] simple dislike for him.).  In addition, the snubs to which Weerasinghe was allegedly subjected – refusing to sit next to her and not inviting her to lunch - are not actionable.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006) (discussing material adversity in a Title VII case, the Supreme Court noted that courts have correctly held that personality conflicts at work that generate antipathy" and " 'snubbing' by supervisors and co-workers" are not actionable).  Accordingly, Weerasinghe has not presented direct evidence of discrimination and the Court must proceed with *the McDonnell Douglas* analysis.

**b.    McDonnell Douglas Framework**

Under *McDonnell Douglas*, a plaintiff in a § 1981 case must first establish a prima facie case of discrimination by showing (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *Colon v. Fashion Inst. of Tech. (State Univ. of New York)*, 983 F. Supp. 2d 277, 288 (S.D.N.Y. 2013).  If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a race-neutral reason for its actions.  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,* 589 U.S. 327, 340, 140 S. Ct. 1009, 1019, 206 L. Ed. 2d 356 (2020); *Littlejohn v. City of New York,* 795 F.3d 297, 307 (2d Cir. 2015).  The employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle.  This is because it is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory.  *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 111 (W.D.N.Y. 2002) (citing Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985).  Indeed, federal courts must refrain from second-guessing decision making, *see Montana v. First Fed. Sav. &*

35

*Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989), and may not "sit as super personnel departments, assessing the merits — or even the rationality — of employers' non-discriminatory business decisions." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 825 (1st Cir. 1991).

If the employer establishes a legitimate nondiscriminatory reason for its actions, the *McDonnell Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of "discrimination vel non," and the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *St. Mary's Honor Cntr. v. Hicks,* 509 U.S. 502, 507 (1993); *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998)("the thick accretion of cases interpreting the burden shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases . . . the plaintiff has the ultimate burden of persuasion). Ultimately, in a section 1981 case, a plaintiff must "prove that, but for race, [she] would not have suffered the loss of a legally protected right. *Comcast Corp*. 589 U.S. at 341.

Although the prima facie showing is "quite easy to meet," *see Mesnick,* 950 F.2d at 823, Weerasinghe has not carried that burden.[21] In order to raise an inference of discrimination, Weerasinghe has attempted to show disparate treatment between herself and similarly situated employees outside of her race. *See Shamciyan v. Acacia Network, Inc.*, No. 22 CIV. 2122 (JPC), 2023 WL 6214546, at *5 (S.D.N.Y. Sept. 24, 2023) (citing *Mandell v. Cnty. of Suffolk,* 316 F.3d

---

[21] The parties do not dispute that Weerasinghe was a member of a protected class or that she suffered an adverse employment action.

368, 379 (2d Cir. 2003). Weerasinghe has compared herself to Cebelenski, Cheng and Meier, who were ASDs and performed many of the same tasks. While Weerasinghe and her co-worker's circumstances need not be identical, there should be a reasonably close resemblance of facts and circumstances - in other words, an objectively identifiable basis for comparability. *See Weiss v. La Suisse,* 260 F. Supp. 2d 644, 655 (S.D.N.Y. 2003); *Harlow v. Molina Healthcare, Inc.*, 723 F. Supp. 3d 116, 128 (N.D.N.Y. 2024) (citing *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir. 2000) ("When a plaintiff advances a theory of disparate treatment, she must show that "she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself.").

In this case, Cebelenski was Scalese's first and longest serving ASD. Def.'s Rule 56.1 Stmt. ¶ 52. In fact, it is undisputed that he was among the most experienced ASDs at the firm and consistently had the highest or one of the highest producing teams. *Id.* ¶ 53. More importantly, Cebelenski served as the de facto leader of the Garden City office because Scalese was primarily based in Roslyn. *Id.* ¶ 63. Scalese testified that he factored Cebelenski's leadership contribution into both his allowance and incentive pay. Scalese Decl. ¶ 11.

Cheng also served as a leader at Garden City until his transfer to Roslyn. *Id.* He too was compensated for his leadership role. *Id.* In addition, it is undisputed that Cheng consistently met or substantially met all of his benchmarks and had one of the top producing teams at Scalese's firm. *Id.* ¶ 58. In fact, the ACDs referred to him as "Steady Eddie." *Id.* ¶ 173. In addition, Cheng realized his success despite being assigned fewer financial advisors from McDermott. *Id.* ¶¶ 92, 93. In 2011, Cheng also met his VJT goal and was on target for getting two of his advisors to qualify for the Leaders Conference. *Id.* ¶¶ 179, 181. Indeed, Weerasinghe does not dispute that he was considered an "inspiration in the office." *Id.* ¶ 184.

37

Similarly, Meier, who did not join the group until July 2010, was unique in that he brought a decade of investment and wealth management experience, including serving as vice president at a sophisticated financial services firm. *Id.* ¶ 70. Although it is true that he was assigned more agents than Weerasinghe in 2010 when he first joined, *see* Pl.'s Rule 56.1 CounterStmt. ¶ 171; Def.'s Reply to Pl.'s Rule 56.1 CounterStmt. ¶ 171, the fact remains that throughout 2011, Meier hit his GDC goals, his goal for getting advisors of certain experience to achieve certain benchmarks and was on track with getting inexperienced advisors to qualify for the Leaders Conference. *Id.* ¶¶ 179, 181. It is also undisputed that Meiers' third quarter of 2011 was "exceptional." *Id.* ¶ 184. In addition, in early 2012, when Weerasinghe hit 60% of her GDC goal and was on track for 50% of her benchmarks, Meier hit 70% of his GDC goal and 56% of his benchmarks. *Id.* ¶¶ 187, 188. As such, everything considered, Weerasinghe has failed to demonstrate that Cebelenski, Cheng and Meier's circumstances were materially similar to hers.

Moreover, even if Weerasinghe had met the minimal burden required to establish a prima facie case, MLIC has provided ample evidence that it had a race-neutral reason for reducing her allowance and incentive pay. To this end, the manner in which Scalese determined the Management Compensation Plan Target for ASDs and their pay is largely undisputed. *Id.* ¶¶ 135-41. Of particular note, satisfaction of an ASD's GDC benchmark was a substantial consideration in his pay recommendation. Scalese Decl. ¶ 37. Scalese also considered his ASD's ability to recruit financial advisors and increase those advisors' GDC production (particularly with respect to new or inexperienced hires) in order to gauge his ASD's effectiveness. *Id.* ¶ 38.

The record before the Court makes clear that Weerasinghe missed her GDC targets in both 2010 and 2011. *See* Scalese Decl. Ex. G; Def.'s Rule 56.1 Stmt. ¶¶ 73, 149, 151 and 166.

38

In fact, with the exception of Clemans who received no incentive payments and Amitrano who only missed her target by 16% (Weerasinghe had missed her 2010 target by 26%), no other ASD missed a substantial portion of their GDC benchmark and produced so little that year. *See* Def.'s Rule 56.1 Stmt. ¶¶ 164, 171. Similarly, for 2011, Weerasinghe was given a GDC benchmark of 2,705,720 GDCs. *Id*. ¶ 165. But by year end 2011, her team had only generated 2,341,594 GDCs. *Id*. ¶ 166.

Further, an overwhelming portion of the GDC generated by Weerasinghe's unit in 2010 was attributed to a handful of seasoned advisors, some having worked at MLIC since the 1980s and 1990s. Scalese Decl. ¶ 49. Those advisors had been assigned to Weerasinghe when she transferred to his firm so Scalese did not think she added to the value of their production. *Id.* Similarly, during the relevant time period, many of Weerasinghe's new hires were recruited by McDermott. *Id.* ¶ 50. As such, Scalese avers that he did not believe she was bringing in a sufficient number of new producers. *Id.* ¶ 51.

What's more, Weerasinghe has not gathered the type of evidence upon which a jury could determine that MLIC's explanation for reducing her pay was a pretext for racial discrimination. *See Harlow v. Molina Healthcare, Inc.,* 723 F. Supp. 3d 116, 128-29 (N.D.N.Y. 2024) ("To survive summary judgment, [a plaintiff] must demonstrate discriminatory animus by [the defendant]. Evidence of disparate pay alone does not demonstrate intentional race discrimination."). As noted above, Weerasinghe cannot rely on the fact that Cebelenski, Cheng and Meier received higher pay because they were not similarly situated to her in all material respects. *C.f. Graham v. Long Island R.R.,* 230 F.3d 34, 43 (2d Cir. 2000). "[C]laims of disparities in pay, without more, are insufficient to demonstrate discriminatory animus." *Whitt v. Kaleida Health*, 298 F. Supp. 3d 558, 575 (W.D.N.Y. 2018). In addition, as discussed in detail

39

above, Weerasinghe has not produced any direct or circumstantial evidence of race-based animus, such as evidence of derogatory remarks or offensive language directed at her.  In fact, Weerasinghe's evidence of MLIC's racial animus primarily involves isolated remarks about other co-workers or personal snubs which are insufficient to raise an inference of discrimination.

Finally, it is undisputed that Scalese was responsible for recommending Weerasinghe's pay increases and decreases.  Def.'s Rule 56.1 Stmt. ¶¶ 26-30.  While Weerasinghe asserts that he did so in consultation with Candito, the fact remains that in 2008, 2009 and 2010, Scalese has actually increased her compensation.  Def.'s Rule 56.1 Stmt. ¶¶ 11-13.  Because the same actor was responsible for her pay increases and decreases, the Court may draw an inference that the pay determination was not with discriminatory intent.  *See Farmer v. Shake Shack Enters*., LLC, 473 F. Supp. 3d 309, 329 (S.D.N.Y. 2020) (finding it difficult to impute invidious motivation where the same actor hired and fired the plaintiff).  Accordingly, the Court believes that no reasonable juror could determine that but for race, Weerasinghe would not have had her pay decreased.  Thus, the undersigned recommends that Weerasinghe's unequal pay claim under Section 1981 be dismissed.

### 2.      Hostile Work Environment

Weerasinghe's § 1981 hostile work environment claim is centered around her conflicts with Candito and Scalese's alleged change in attitude toward her after Candito's arrival.  Weerasinghe Decl. ¶ 40(b).  Specifically, she asserts that Candito treated her "differently and more harshly" than he treated Caucasian, White color and Chinese descent/Light color ASDs.  *Id.*  She also alleges that, influenced by Candito, Scalese changed his attitude toward her and became negative and hostile.  *Id.*  "To establish a hostile work environment under . . . § 1981 . . ., a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule,

and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993)).  The examples Weerasinghe has offered of the alleged hostile treatment are insufficient to do so.

First, she points to the "disciplinary letter" she received in October 2010 when she missed her benchmarks as an example of the hostility.  As previously noted, Scalese drafted a memorandum in October 2010 that included a chart comparing the benchmarks he had set for her to her actual performance.  Scalese Decl. Ex. G.  He also met with her and made clear that her unit production had to meet or exceed the firm's goals.  While receipt of the memorandum and the discussion may have been unpleasant, it certainly cannot be considered severe or pervasive.

Weerasinghe also claims that in the summer of 2011, Candito pulled her out of a meeting to tell her that she had failed exams and had to renew her Series 6 and 63 licenses.  Weerasinghe Decl. ¶ 41.  She says that a later inquiry revealed that she had passed the exams and her licenses were in effect.  *Id*.  In addition, Weerasinghe claims that on several occasions she was told by him that the office was hiring a new, male ASD to replace her but she acknowledges that MLIC did not hire anyone before she left in 2012 on disability leave.  *Id.* ¶ 42.  She further takes issue with the fact that, following her injury, she was asked not to leave the office to recruit agents or to use "Wall Street Jobs" as a recruiting source.  *Id*. ¶ 42.  Finally, Weerasinghe claims that Candito screamed at her, that his behavior was "ugly" and that she was humiliated when she was excluded from a winery trip.  *Id.* ¶ 43(b)(c).  Again, while clearly upsetting to Weerasinghe, these allegations do not describe the type of conduct that a reasonable juror could consider so severe as to have altered the conditions of her employment.  *See Fleming v. MaxMara USA, Inc.*, 371 Fed. Appx. 115, 119 (2d Cir. 2010) (concluding that no hostile work environment existed

even though "defendants wrongly excluded [the plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her"); *Davis-Molinia v. Port Auth. of New York & New Jersey, No. 0*8 CV 7584 GBD, 2011 WL 4000997, at *11 (S.D.N.Y. Aug. 19, 2011), aff'd, 488 F. App'x 530 (2d Cir. 2012)(finding that "diminished [job] responsibilities," "exclu[sion] from staff meetings," deliberate "avoid[ance]," "yell[ing] and talk[ing] down to," and an increased workload of menial tasks, among other factors, was not enough to show that defendants' conduct was sufficiently severe or pervasive).  Accordingly, the undersigned also recommends that Weerasinghe's Section 1981 hostile work environment claim be dismissed.[22]

### 3.    Retaliation

Lastly, Weerasinghe included a vague reference to retaliation in her § 1981 claim, which the Court must also consider.  Second Am. Compl. ¶ 36.  Specifically, Weerasinghe stated that "[t]he averments contained in paragraphs 1-34, . . . set forth the particulars of the . . . retaliation the Plaintiff has suffered at the hands of Defendant MLIC because of her race and color." Second Am. Compl. ¶ 36.  To be clear, the complaint does not contain specific details concerning race-based retaliation.  At best, the complaint states that Weerasinghe complained to Candito and Scalese about race discrimination in 2012 and asked to be assigned agents to meet her goals but they failed to do anything to repair her low agent count.  *See Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001) ("Because of the potential for abuse, '[the Second Circuit has] insisted on a higher level of detail in [the] pleading[s],' and held that 'a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the

---

[22] It warrants mention that Weerasinghe has referenced gender in her affidavit in connection with the hostile work environment claims.  Gender discrimination is not covered by Section 1981. *See Alexander v. City of N.Y.*, 957 F. Supp. 2d 239, 247 (E.D.N.Y.2013). ¶ 36

pleadings alone.'")(internal citations omitted).

Nonetheless, Weerasinghe now asserts, in her opposing papers, that Scalese retaliated against her for complaining to him that Candito was assigning agents to her in a discriminatory manner, complaining about taking away a valuable opportunity from Baptiste and helping Choudhury and Tourabi bring their complaint of discrimination.  Pl.'s Rule 56.1 Add'l Stmt. ¶¶ 12-16.  She further asserts that as a result of lodging those complaints, she received the October 2010 memorandum, a reduction in her 2010, 2011 and 2012 pay and was subjected to the hostile work environment described above.  *Id*. ¶¶ 15-16.

In order to make out a prima facie case of § 1981 retaliation, Weerasinghe must establish that (1) she engaged in protected activity; (2) MLIC was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Benedith v. Malverne Union Free Sch. Dist.,* 38 F. Supp. 3d 286, 322 (E.D.N.Y. 2014) (citing *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 66 (2d Cir. 1998)).  "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination,'" *Id*.  Significantly, "[t]he onus is on the speaker to clarify to the employer that [s]he is complaining of unfair treatment due to [her] membership in a protected class and that [s]he is not complaining merely of unfair treatment generally.'" *Id*. (internal citations omitted).  In this case, it is entirely unclear whether Weerasinghe indicated that she was complaining about race discrimination when she approached Scalese about the valuable "VPL" taken from Baptiste, the manner in which agents were being assigned to her or Candito's.

In fact, the subject of the grievances described in the complaint concern only the unfair treatment of female employees.  Notably, Weerasinghe alleges:

19. MLIC breached its promises to Weerasinghe made by Scalese in

43

2009 and again in early 2010 to assign Weerasinghe a fair share of the competent agents available; instead **Weerasinghe did not receive agents at all or received very poor prospects, while numerous effective agents were assigned to male Agency Sales Directors**. As set forth below, MLIC's failure to assign competent agents to Weerasinghe as Scalese had promised, **and MLIC's failure to assign agents to Weerasinghe on the same basis that agents were assigned to the male Agency Sales Directors greatly diminished Weerasinghe's income,** in violation of New York Labor Law § 191 and § 194. Scalese and Candito acted (or failed to act) as follows:

a. On August 30, 2010, Scalese and Weerasinghe met over lunch. She complained that he had not assigned agents to her, contrary to the promises that he had made to her at the end of 2009 and in early 2010. In response, he promised that 50% of all new hires would be assigned to Weerasinghe's team. Thereafter, Weerasinghe observed that in the first week of September 2010— that is, in the week following her lunch with Scalese—the office hired five new agents, but none was assigned to her. As of September 24, 2010, Weerasinghe had received only two agents in 2010.

b. Assigning Weerasinghe fewer agents and assigning those agents at the very end of the year. As a result, **Weerasinghe generally had only approximately 22-23 agents reporting to her while male Agency Sales Directors had between 40-60 agents reporting to them**. Because Agency Sales Directors receive bonuses based on the sales and earnings of the agents who report to them, having fewer agents reporting to her adversely affected Weerasinghe's income.

c. **Assigning agents to Weerasinghe who had little or no sales experience and/or with no natural market while agents with sales experience and/or a natural market were assigned to the male Agency Sales Directors.** The agents assigned to Weerasinghe earned very little, thereby further reducing Weerasinghe's bonuses. In particular, at the end of 2011, Candito assigned six essentially useless agents to Weerasinghe, agents to whom she had to pay attention but from whom it was virtually impossible to get any production of business. The agents were assigned to her as follows: one on November 7, one on November 28, one on December 5, and three on December 27, 2011—all arrived too late to complete any business in 2011 and at least four of them had left by early 2012.

d. Weerasinghe also observed that when an insurance agent was failing, **Scalese and/or Candito would take the failing agent away from a male Agency Sales Director and assign the failing agent to her**. And also that the converse occurred, when a productive agent who reported to Weerasinghe was re-assigned to a male Agency Sales Director, see paragraph 18.i, above.

Second Am. Compl. ¶ 19 (emphasis added).  In fact, Weerasinghe also complains about the assignment of agents to male ASDs in paragraphs 19 (e) and (f), 20 and 21 of the complaint.  *Id.* ¶¶ 20, 21.  She even characterizes the manner of assigning agents as "sex-based negative treatment." *Id*.  In none of these paragraphs, does she suggest the assignments were based on race.

Similarly, she offers numerous examples of Candito's overall treatment of women as compared to men:

> Candito ignored and avoided and ostracized [her], was rude to her . . . would yell at her, use profanities, he pounded on the table, and was demeaning. **He did not treat any male [ASDs] in the same manner. . .**
>
> On occasion, Candito would even scream and use profanities at Weerasinghe in the public parts of the office. **Candito did not scream at any male Agency Sales Director or use profanity to any male Agency Sales Director in public**. . ..
>
> **Candito subjected Weerasinghe to much greater and stricter scrutiny than he afforded male Agency Sales Directors** and he criticized her far more than he criticized male Agency Sales Directors. . ..
>
> Candito himself terminated Weerasinghe's agents, without prior discussion with Weerasinghe and without even giving her notice, **while he consulted with the male Agency Sales Directors before terminating any of their agents**.

*Id.*  She then lists a series of derogatory comments made by Candito, which she asserts showed his "animus toward Weerasinghe on the basis of her sex." *Id*. ¶ 22.  Again, the allegations do not reference race.

Moreover, the incident concerning Baptiste does not appear to be based on racial animus:

> In September 2010, Candito and Scalese compelled Weerasinghe to remove a very valuable case from one of her agents, a case that they then assigned and/or arranged to assign to Scalese's wife. Weerasinghe's agent had developed the case and had signed the agreement, in which his client (an employer)

contracted to allow approximately 669 employees to buy insurance from MLIC through Weerasinghe's agent. The case was very valuable to the agent, who would have received commissions and also could expect to receive repeat business and referrals, and was also valuable to Weerasinghe, who would have received a bonus based on the commissions that her agent earned. On information and belief, the removal of the case from Weerasinghe's agent violated MLIC's internal policies. Weerasinghe does not know of any other occasion when business written by one agent was reassigned to another agent.

*Id.* ¶ 18. In fact, she appears to be complaining that Scalese reassigning a valuable case from an agent to his wife was a form of racial discrimination because it impacted her bottom line. In sum, notwithstanding the vague reference to color contained in paragraph 24 of the complaint ("I am being discriminated against because I am a woman and because of my color"), there is every reason to believe that the complaints she made to Scalese and Candito about the assignments of agents, the reassignment of Baptiste's case or Candito's conduct focused solely on gender.

What's more, her current contention that she complained to Scalese about the conduct in 2010 is also suspect. *See* Weerasinghe Decl. ¶ 112. A careful comparison of the averments set forth in her declaration and the allegations in the complaint suggest that the conversation with Scalese took place in 2012, not 2010. In the second amended complaint, Weerasinghe alleged:

> In the first four months of 2012 Weerasinghe repeatedly said to Candito, in sum and substance, "I am being discriminated against because I am a woman and because of my color. Please assign agents to me so I can meet my goals." She also said to him many times, in sum and substance, that he was harassing her because she was a woman and because of her color. She told him, "You don't do that to Bing and Rick" two male Agency Sales Managers. On information and belief, Candito went to Scalese and reported that Weerasinghe was complaining of discrimination. Scalese then called Weerasinghe into his office and said, Weerasinghe was referring to the annual sales goals that MLIC set each year for Weerasinghe's team, and which Weerasinghe was responsible to meet. *very angrily, in sum and substance,* **"I don't want to hear about discrimination. You don't do that. My wife is Spanish. I don't discriminate. My fucking wife is my fucking wife."** Weerasinghe told Scalese that Candito had assigned only two agents to her. Scalese said, "I didn't know that." Neither Candito nor Scalese did anything to repair Weerasinghe's very low agent count. Weerasinghe continued to have fewer

agents and less competent agents than the male Agency Sales Directors until she went out on disability on May 7, 2012.

Second Amended Compl. ¶ 24 (emphasis added). Yet, after MLIC argued in its memorandum that there can be no causal connection between the 2012 discussion and the alleged adverse action, all of which predated that conversation, Weerasinghe averred:

> In approximately September of 2010, I complained to [Scalese] that [Candito] was assigning new agents to the other ASDs who were male and of the Caucasian race and White color or male and Chinese and Light skinned and thereby discriminating against me by not giving me my fair share of new agents. [**Scalese] said, in sum and substance, "I don't want to hear about discrimination in my office. There is no discrimination in my office**."

Weerasinghe Decl. ¶ 112 (emphasis added). It certainly appears to the Cour that Weerasinghe is describing the same conversation. In any case, even if Weerasinghe were describing a separate conversation, it would be highly prejudicial to MLIC to permit Weerasinghe to rely on a new set of operative facts at this point in the litigation. *See Ansam Assoc., Inc. v. Cola Petroleum*, 760 F.2d 442, 446 (2d Cir. 1985).

Assuming, therefore, as MLIC has argued, that Weerasinghe first complained about race based discrimination in connection with the assignment of agents, Candito's conduct and Baptiste's loss of business in the first four months of 2012, the Court agrees that the complaint cannot be causally connected to the alleged actions taken by MLIC. "There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity." *See Paupaw-Myrie v. Mount Vernon City Sch. Dist.,* 653 F. Supp. 3d 80, 104 (S.D.N.Y. 2023)

Last, the Court must also address Weerasinghe's claim that, in early 2010, she helped Choudhury and Tourabi, two agents of Brown color who reported to her, to bring their complaint of discrimination to Scalese. Weerasinghe Decl. ¶¶ 31-34. While voicing the complaints of

Choudhury and Torabi could count as protected activity, *see Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010), Weerasinghe did not allege in the complaint that Scalese or Candito had retaliated against her for aiding two colleagues in complaining about racial discrimination.  In fact, MLIC notes that Weerasinghe did not even identify Choudhury or Tourabi in her Rule 26(a) disclosures or in her interrogatory responses as individuals having knowledge or information relevant to her claims. *See* Weber Decl. Ex. A, B.  Again, it would be highly prejudicial to permit Weerasinghe to expand the scope of her claims at this stage in the litigation.

In addition, the causal connection between Choudhury and Tourabi's complaints and the alleged adverse action taken by MLIC is too attenuated.  According to Weerasinghe's declaration, the alleged discussion with Scalese about Choudhury and Tourabi took place in February 2010 after she returned from her disability leave, *see* Weerasinghe Decl. ¶ 33, many months before the issuance of the October memorandum or the reduction in her 2010, 2011 and 2012 pay.  *Paupaw-Myrie v. Mount Vernon City Sch. Dist.*, 653 F. Supp. 3d 80, 104 (S.D.N.Y. 2023) (courts have found that four and a half months is too long to draw a causal inference based on a temporal relationship).  Moreover, Weerasinghe acknowledges that it was the loss of Choudhry and Tourabi's business that "greatly reduced" her GDCs and impacted her incentive pay.  Weerasinghe Decl. ¶¶ 37, 105.  In fact, it is clear that the loss of Choudhury and Tourabi not only reduced Weerasinghe's GDCs, but it also led to a negative reversal of business that MLIC credited against her unit. Def.'s Rule 56.1 Stmt. ¶ 160.

Finally, it warrants repeating that MLIC has proffered extensive and largely undisputed evidence detailing Weerasinghe's performance, her evaluation and the rationale for her reduction in pay.  Aside from suggesting a temporal proximity to these alleged complaints, Weerasinghe

48

had not proffered any evidence to contradict MLIC's proffered legitimate, nonretaliatory reasons for its actions and "temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Johnson v. Schmid*, 750 F. App'x 12, 18 (2d Cir. 2018). Accordingly, the Court finds that no reasonable trier of fact could conclude that Weerasinghe's alleged complaints were "but for" reason for the issuance of the October 2010 memorandum or the reduction in her pay. Thus, the undersigned also recommends dismissal of the Section 1981 retaliation claim.

### C.      Supplemental Jurisdiction

Given the undersigned's recommendation that Weerasinghe's only federal claim be dismissed, the Court must next consider whether it should exercise supplemental jurisdiction over Weerasinghe's New York Equal Pay, breach of contract and conversion claims. "'[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.'" *Pinkard v. Cnty. of Suffolk,* No. 18-CV-5590 (JMA) (AYS), 2025 WL 1456550, at *9 (E.D.N.Y. May 21, 2025) (citing 28 U.S.C. § 1367(a)). "A district court's exercise of supplemental jurisdiction is governed by 28 U.S.C. § 1367." *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 304–05 (2d Cir. 2003) (citing 28 U.S.C. § 1367(a)).

"Supplemental jurisdiction is not mandatory, and courts should, under certain circumstances, 'decline to exercise supplemental jurisdiction over a claim.'" *Pinkard,* 2025 WL 1456550, at *9 ( (citing 28 U.S.C. § 1367(c)). Indeed, "[f]ederal courts 'have an independent obligation to consider the presence or absence of subject matter jurisdiction sua sponte.'" *Eisenhauer v. Culinary Inst. of Am.*, No. 19-CV-10933 (VR), 2024 WL 1833601, at *2 (S.D.N.Y. Apr. 26, 2024) (citing *Hunter v. McMahon*, 75 F.4th 62, 66 (2d Cir. 2023)). "Courts

deciding whether to exercise supplemental jurisdiction must balance the so-called *Gibbs* factors outlined by the Supreme Court in *United States v. Gibbs*, 383 U.S. 715, 726 (1966)." *Id.* "Those factors include the "values of judicial economy, convenience, fairness, and comity." *Id.* (citing *Delaney v. Bank of Am. Corp*., 766 F.3d 163, 170 (2d Cir. 2014)). "The Supreme Court has [also] instructed that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of [these] factors . . . will [often] point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Id.* (citing *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, n. 7, 108 S. Ct. 614, 619, 98 L. Ed. 2d 720 (1988)). This is especially true when the remaining claims involve unresolved issues of state law. *Id.* (citing 28 U.S.C. § 1367(c)(1)).

Factors of judicial economy include the Courts "familiarity with the facts, the timing of the case, the number of parties and claims, the amount of discovery, and whether there is ongoing parallel litigation." *Id*. "In weighing convenience, courts ask whether the case is easily resolvable, and, if it is, whether it is more appropriate to resolve the case than decline to exercise jurisdiction." *Id.* "Fairness involves questions of equity: Will declining jurisdiction prejudice the parties, and are the parties responsible for any such prejudice?" *Id. (citing Chenensky v. New York Life Ins. Co.,* 942 F. Supp. 2d 388, 392 (S.D.N.Y. 2013)).

The age of this case and the potential for further cost and delay in the state court certainly weigh in favor of retaining jurisdiction over Weerasinghe's state law claims. This case has been pending since 2019 and the parties engaged in discovery and motion practice in this Court. In addition, little remains for this Court to do beyond deciding the legal issues on summary judgment and, while a state court could also handle the remaining claims, the parties would be prejudiced by the additional time and preparation that would be required if the case returned to

50

the state court. As such, the factors of judicial economy, convenience and fairness weigh in favor of retaining the case.

The final factor- comity- also points toward retaining jurisdiction in this case. "[C]omity, considers 'the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims.'" *Id.* (citing *City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 173, 118 S. Ct. 523, 533, 139 L. Ed. 2d 525 (1997)). "The *Gibbs* Court recognized that a federal court's determination of state-law claims could conflict with the principle of comity to the States and with the promotion of justice between the litigating parties. *Valencia*, 316 F.3d at 305. As such,"[c]omity is especially implicated when state law has not been definitively interpreted by the state courts." *Eisenhauer,* 2024 WL 1833601, at *3 (citing *Chenensky*, 942 F. Supp. 2d at 395).

Until very recently, Weerasinghe's claim of gender pay disparity under New York Labor Law § 194 involved an unresolved question of state law. Specifically, until October 2019, New York Labor Law § 194 provided that

> [n]o employee [would] be paid a wage at a rate less than the rate at which an employee of the opposite sex in the same establishment [was] paid for equal work on a job the performance of which require[d] equal skill, effort and responsibility, and which [was] performed under similar working conditions.

*Eisenhauer v. Culinary Inst. of Am*., 84 F.4th 507, 524–25 (2d Cir. 2023).[23] The statute provided four exceptions to that prohibition. *Id*. Namely, the statute excludes pay disparities "made pursuant to a differential based on: (a) a seniority system; (b) a merit system; (c) a system which measures earnings by quantity or quality of production; or (d) a bona fide factor other than sex.[24]

---

[23] "Since October 2019, it has also prohibited pay discrimination on the basis of "status within one or more protected class or classes. *Id.* at 525.

[24] In January 2016, New York State's legislature amended the fourth exception, changing the language from "any other factor other than sex" to "a bona fide factor other than sex." *Id*.

*Id.* "Since January 2016, § 194(1) has required the "bona fide factor other than sex" exception to "be job-related with respect to the position in question." *Id*.

Assessing the job-related requirement, in October 2023, the Second Circuit admonished district courts to analyze a plaintiff's § 194 claim as altogether distinct from a federal equal pay claim in actions where plaintiffs assert claims under both the federal Equal Pay Act ("FEPA") (29 USC § 206[d]) and New York's Labor Law § 194(1). *See Eisenhauer v. Culinary Inst. of Am*., 84 F.4th 507, 524–25 (2d Cir. 2023). Although Weerasinghe has not asserted a claim under 29 USC § 206, the procedural history and resulting decisions in the *Eisenhauer* case are relevant to the comity issue before this Court. Notably, when the Second Circuit remanded the case to the District Court, it required the District Court to first decide whether to invoke its discretion to exercise supplemental jurisdiction over that state-law claim.

On remand, the Southern District concluded that "comity strongly counsel[ed] against exercising supplemental jurisdiction." *See Eisenhauer*, 2024 WL 1833601, at *4. Judge Reznik was concerned that there was "a dearth of caselaw in this District applying or interpreting" the job-relatedness requirement under § 194(1). *Eisenhauer*, 2024 WL 1833601, at *4. In fact, Judge Reznik noted that she had failed to find any applicable state court case that had definitively interpreted § 194(1)'s job-relatedness requirement. *Id.* As a result, the Southern District did not exercise supplemental jurisdiction. However, since the issuance of Judge Reznik's decision, the Eisenhauer parties have returned to the state court and, in June 2025, the Supreme Court of Dutchess County addressed the previously unconstrued job-relatedness requirement providing clear guidance. *Eisenhauer v. Culinary Inst. of Am.,* 242 N.Y.S.3d 449, 455, 478 (N.Y. Sup. Ct. 2025). Accordingly, the undersigned concludes that the Court may

exercise supplemental jurisdiction over the remaining New York Equal Pay, breach of contract and conversion claims.

### D. Weerasinghe's New York Equal Pay Claim

Notwithstanding the above, the undersigned does not believe that MLIC's motion seeking to dismiss Weerasinghe's New York Equal Pay claim can be decided at this time. Weerasinghe's claim will turn on the Court's analysis of Section 194 exceptions and the parties' papers refer to outdated law. For example, MLIC incorrectly notes that "[c]laims for alleged violations of New [York Equal Pay Act] 'may be evaluated under the same standard' as the federal Equal Pay Act." C.f. Eisenhauer, 84 F.4th at 524–25. MLIC also refers to the pre-amendment exception - "any other factor other than sex." Def.'s Mem at 5. Weerasinghe has not provided the Court with any legal analysis of the provision. As such, supplemental briefing is required in order to resolve this portion of the motion. Thus, the Court recommends that to the extent MLIC's motion seeks to dismiss the New York Equal Pay Act claim, it be dismissed with leave to renew.[25]

### E. Weerasinghe's Breach of Contract and Conversion Claims

### 1. Breach of Contract

Weerasinghe alleges that MLIC breached her "written and oral" employment agreements by failing to pay allowance, incentive opportunity, cash opportunity, commissions, bonuses and

---

[25] The undersigned has not addressed Weerasinghe's claims for the payout of unused vacation pay as this claim was incorporated into her New York Labor Law Claim. It is unclear whether she intended to incorporate the claim into her gender disparity claim or is seeking to assert a separate cause of action under New York Labor Law § 191. In any case it warrants mention that N.Y. Lab. Law § 191 provides: "[i]f employment is terminated, the employer shall pay the wages not later than the regular pay day for the pay period during which the termination occurred, as established in accordance with the provisions of this section. N.Y. Lab. Law § 191 (McKinney). According to the statute, "[t]he term 'wages' also includes benefits or wage supplements [(including vacation pay)], . . . except for the purposes of [§ 191]." N.Y. Lab. Law § 190 (McKinney). Accordingly, the undersigned agrees with MLIC, that to the extent Weerasinghe is seeking to assert a separate claim for unpaid vacation pay, her claim would fail.

vacation pay.  Second Am. Compl. ¶ 32.  She also complains that MLIC failed to assign her new (and competent) agents.  *Id.*  Lastly, she complains that MLIC forbade her to write insurance business on her own behalf, to attend Leaders Conferences and to attend outings.  *Id.*  "To state a claim for breach of contract under New York law, 'the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of [the] defendant to perform; and (iv) damages.'" *Newman v. ASA Coll., Inc.*, 754 F. Supp. 3d 521, 542 (S.D.N.Y. 2024) (citing *Johnson v. Nextel Communications, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).  "'Generally, a party alleging a breach of contract must demonstrate the existence of a . . . contract reflecting the terms and conditions of their . . . purported agreement'" *Canzona v. Atanasio,* 118 A.D.3d 837, 839, 989 N.Y.S.2d 44 (2014) (citing *Mandarin Trading Ltd. v Wildenstein,* 16 NY3d 173, 181-182 (2011)).  A party alleging a breach of contract must also identify the provisions of the contract that were breached.  *Id.*  Weerasinghe cannot do so.

To begin with, it is undisputed that the contract Weerasinghe signed (the "Appointment"), required her to act "subject to the general supervision and direction of the Management of the sales office to which [she is] assigned."  Def.'s Rule 56.1 Stmt. ¶ 7.  The Appointment provided that Weerasinghe would be paid in accordance with MLIC's Compensation Plan, which could be changed by MLIC from time to time.  *Id*. ¶ 8.  Effective January 2010, MLIC implemented a new compensation plan, departing from its prior compensation structure by linking an ASD's compensation more closely to the ASD's production.  *Id*. ¶¶ 96, 97.  Pursuant to that plan, an ASD's allowance was not guaranteed and the amount could be adjusted at any point to reflect the firm or an ASD's unit's performance.  *Id*. ¶¶ 99, 103.  *Cuervo v. Opera Sols. LLC*, 87 A.D.3d 426, 427, 928 N.Y.S.2d 26, 27 (2011) (finding the reduction in a plaintiff's commissions did not violate the contract where employer has

expressly reserved the right to modify the commission structure); *see also Namad v. Salomon Inc.*, 147 A.D.2d 385, 387, 537 N.Y.S.2d 807, aff'd, 74 N.Y.2d 751, 543 N.E.2d 722 (1989) (finding lower court erred in denying summary judgment where employment contract explicitly reserved to management discretion as to the awarding of any compensation guaranteed in the employment contract itself).

In addition, while Weerasinghe disputes how incentive pay was determined "as it relates to her," see Pl.'s Rule 56.1 CounterStmt. ¶ 102, the record before the Court makes clear that incentive pay was based on an ASD's performance relative to the metrics established by the managing director for each ASD in an individualized business plan. Def.'s Rule 56.1 Stmt. ¶ 101; *see also* Wargacki Decl. ¶ 30. As noted, several times in this opinion, the record is clear that Weerasinghe repeatedly missed her benchmarks. Specifically, Weerasinghe missed her GDC target each quarter in 2010 and ended the year approximately 25% off target, equating to 1.5 million GDCs, which was the reason, MLIC says, Scalese reduced her allowance for 2011. Def.'s Rule 56.1 Stmt. ¶¶ 172-174. She also missed her benchmarks in 2011 – generating 1.6 million GDCs of approximately 2.3 million GDCs she was given as a target. *Id.* ¶¶ 165-168.

Moreover, it is undisputed that, as the Managing Director, Scalese had the discretion to define the responsibilities of a given position to suit the needs of his firm and, in doing so, had barred all ASDs from writing business. *Id.* ¶¶ 46, 48. Weerasinghe has pointed to no contractual provision that guaranteed her the right to write that business. Similarly, ASDs were not entitled, by contract, to receive agents from the firm. *Id.* ¶ 89. Weerasinghe does not appear to dispute the absence of a written provision addressing this issue but, instead, alleges that Scalese made an oral promise to her to provide her with "new and competent" sales representatives and a "fair share" of business. Second Am. Compl. ¶ 32. However, "[b]efore the power of law can be

55

invoked to enforce an [oral] promise, it must be sufficiently certain and specific so that what was promised can be ascertained. *McCluskey v. Cnty. of Suffolk*, 9 Misc. 3d 1106(A), 806 N.Y.S.2d 446 (Sup. Ct. 2005). Where, as here, an oral agreement is not reasonably certain in its material terms, and for an unspecified period of time, there can be no legally enforceable contract. *Id.*

Finally, Weerasinghe has also failed to point to a provision that guaranteed her the right to attend Leaders Conferences regardless of her performance. As such, the Court agrees that Weerasinghe has failed to establish a legally enforceable right to any of the alleged items in her list of breaches and recommends that the breach of contract claims be dismissed.

### 2.      Conversion

"According to New York law, '[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 403–04 (2d Cir.), certified question accepted, 7 N.Y.3d 837, 857 N.E.2d 528 (2006), and certified question answered, 8 N.Y.3d 283, 864 N.E.2d 1272 (2007) (citing *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995)). "It . . . requires that the defendant exclude the owner from exercising her rights over the goods." *Id.* (citing *New York v. Seventh Regiment Fund, Inc.,* 98 N.Y.2d 249, 259, 746 N.Y.S.2d 637, 774 N.E.2d 702 (2002)). In this case, Weerasinghe alleges that MLIC failed to return property to her after she went out on a leave of absence. Second Am. Compl. ¶ 34. It is undisputed that Weerasinghe left items in her office and, more than a year after she left, Scalese directed one of his employees to pack up her personal belongings. Def.'s Rule 56.1 Stmt. ¶¶ 193-94. While Weerasinghe takes issue with the items the employee packed, it is clear that she was not barred from coming to the office herself to

retrieve the items.  *Id.* ¶ 197.  The fact that she felt too weak to lift boxes or to drive, is not a

ground to overcome summary judgment on this claim.  Accordingly, the undersigned also

recommends that the conversion claims be dismissed.

### OBJECTIONS

A copy of this Report and Recommendation is being electronically served by the Court

on the parties.  Any objections to this Report and Recommendation must be filed with the Clerk

of the Court with a courtesy copy to the undersigned within 14 days.  Failure to file objections

within this period waives the right to appeal the District Court's Order.  See 28 U.S.C. §

636(b)(1); Fed R. Civ. P 72; *Mejia v. Roma Cleaning, Inc.*, No. 17-3446, 2018 U.S. App. LEXIS

28235, 2018 WL 4847199, at *1 (2d Cir. Oct. 5, 2018) ("Plaintiff has waived any objections to

the Magistrate's finding" by failing to timely object); *Wagner & Wagner, LLP v. Atkinson,

Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir. 2010); *Beverly v.

Walker,* 118 F.3d 900, 902 (2d Cir. 1997).

Dated: Central Islip, New York
      February 11, 2026

                                    /s/
                                ARLENE R. LINDSAY
                                United States Magistrate Judge